BIANCO, J.T.C.
In these consolidated matters, plaintiffs AccuZIP, Inc. (hereinafter “AccuZIP”) and Quark, Inc. (hereinafter “Quark;” and the plaintiffs collectively as “the Corporations”) appeal from final determinations issued by defendant Director, Division of Taxation (hereinafter “the Director”) finding the Corporations liable for the Corporation Business Tax (hereinafter “CBT”), pursuant to the Corporation Business Tax Act N.J.S.A. 54:10A-1 to -41 (hereinafter “the Act”), as a result of computer program sales to New Jersey customers. All parties have moved for summary judgment.
For the reasons set forth herein, AccuZIP’s motion is granted; Quark’s motion is granted in part and denied in part. The Director’s motion as to AccuZIP is denied; but her motion as to Quark is granted in part and denied in part.
The facts are not in dispute:
AccuZIP is a Nevada Corporation with offices in California. It develops and sells computer mailing programs to customers nationwide. One such program allows businesses to clean up mailing lists to prevent duplicate mailings and to pre-sort mail so that businesses’ mailings can qualify for lower postage rates with the United States Postal Service. The programs are sold on CDROMS and contain a licensing agreement, which provides in part:
*163 The agreement limits the purchaser to “use one copy of the specified software product above (“Software”) on a single computer.” In addition, customers
*162 BY USING THIS SOFTWARE YOU ARE AGREEING TO BE BOUND BY THE TERMS OF THIS AGREEMENT. IF YOU DO NOT AGREE TO THE TERMS OF THIS AGREEMENT, PROMPTLY RETURN THE UNOPENED DISK PACKAGE AND ACCOMPANYING ITEMS.
*163 [M]ay have as many copies of the SOFTWARE in use as you have Licenses ... [and] ... if the number of users of the SOFTWARE could exceed the number of applicable Licenses, then you must have a reasonable mechanism or process in place to assure that the number of persons using the SOFTWARE concurrently does not exceed the number of Licenses.
The agreement further states:
2. COPYRIGHT. This SOFTWARE is owned by AccuZIP, Inc., or its suppliers, with a special distribution license to Datatech, and is protected by United States copyright laws and international treaty provisions. Therefore, you must treat the SOFTWARE like any other copyrighted material (i.e. a book or musical recording) except that you may (a) make copies of the SOFTWARE solely for backup or archival purposes, and (b) transfer the SOFTWARE to a single hard disk provided you keep the original solely for backup or archival purposes.
3. OTHER RESTRICTIONS. This AccuZIP/Datatech License Agreement is your proof of License to exercise the rights granted herein and must be retained by you. You may not sublicense, rent or lease the SOFTWARE, but you may transfer your rights under this AccuZIP/Datatech License Agreement on a permanent basis provided you transfer the License Agreement, the SOFTWARE, and all accompanying written materials and retain no copies, and the recipient agrees to the terms of this Agreement. You may not reverse engineer, decompile, or disassemble the SOFTWARE.
5. TERM. This Agreement is effective from your date of receipt and shall remain in effect until terminated. You may terminate this License Agreement at any time by completely destroying the SOFTWARE and all copies in any form. AccuZIP/Datatech may terminate this Agreement if you fail to comply with any of its terms or conditions. Upon any termination of this License, you agree to destroy the SOFTWARE and all copies and written materials. Upon request, you must provide AccuZIP/Datatech with written certification of such destruction.
GOVERNING LAW. This Agreement shall be governed by the laws of California.
AccuZIP marketed its products by placing advertisements in national trade magazines and maintaining a web page at www. accuzip.com. Customers placed orders for AccuZIP products via telephone, e-mail, or fax with an AccuZIP employee in California. The products were then shipped by using a common carrier from the California office. Technical support was provided to customers from the California office. AccuZIP did not have employees in New Jersey and did not own or rent any real property in New Jersey.
*164 Between 1999 and 2001, AccuZIP had ninety-three customers in New Jersey who generated $64,744 in sales (i.e. 2% of the company’s total gross income). In 2002 AccuZIP completed a Nexus Survey at the request of the Director. The Director found that AccuZIP was “doing business” in New Jersey for CBT purposes because it retained title to licensed software in this state. AeeuZIP did not respond to the proposed determination or formal notice of assessment and the Division assessed an estimated CBT of $3,000 plus penalty and interest. AccuZIP timely filed this appeal.
Quark is a privately held Colorado corporation with its principal offices and headquarters in Denver, Colorado. Quark developed and copyrighted a desktop publishing computer program named QuarkXPress. The disks containing the QuarkXPress program were transferred to Quark’s order fulfillment center[1] where they were bundled with a paperback tutorial guide, reference manual and user’s guide into a cardboard box. The box was “shrink-wrapped” with a clear plastic film and transported by a common carrier for delivery around the world. From April 1,1988 through February 25, 1997 Quark sold the QuarkXPress program in the pre-packaged shrink-wrapped boxes to distributors and resellers who resold the product to end users. From February 26, 1997 through the end of the determination period no QuarkXPress programs were sold.
Visible through the shrink-wrapped packaging of the QuarkXPress program is an envelope on which is printed the following notice: “ATTENTION! By opening this envelope you agree to the terms of the Single-User QuarkXPress® License and Limited Warranty Agreement printed on this envelope.” The Single User Software License Agreement provides in pertinent part:
THIS LICENSE AGREEMENT SETS FORTH THE TERMS AND CONDITIONS OF THE LICENSE AND THE LIMITED WARRANTY FOR THE SOFTWARE ON THE ENCLOSED MAGNETIC AND/OR CD-ROM MEDIA. OPENING OF THE ENCLOSED PACKET ... SIGNIFIES YOUR ACCEP *165 TANCE OF THE AGREEMENT. IF YOU DO NOT ACCEPT THIS AGREEMENT, DO NOT OPEN THE PACKET ...
1. LICENSE GRANT: The customer does not receive title to the SOFTWARE. The customer is granted a nonexclusive license to USE the SOFTWARE, subject to the restrictions and terms set forth in this License Agreement. The customer may install the SOFTWARE, and may Use the SOFTWARE on a single computer at a time. The customer may make a single archive copy of the SOFTWARE, provided that it includes all notices and markings in or on the original.
2. RESTRICTIONS: An installed copy of the SOFTWARE may not be USED
on multiple computers through file serving, networking or communication packages. The SOFTWARE may not be rented, loaned, or leased. The customer may not copy the SOFTWARE or accompanying documentation except as specifically permitted in this License Agreement____ The customer may not modify, trans-
late, reverse engineer, disassemble, or decompile the SOFTWARE or accompanying documentation.
3. TERMINATION AND TRANSFER: Any failure to comply with the terms and conditions of this Agreement will result in automatic termination of this license. Upon termination of this license for any reason, the customer must destroy all copies of the SOFTWARE, and accompanying documentation.
14. GOVERNING LAW AND JURISDICTION: This Agreement will be governed by the laws of the State of Colorado.
From August of 1992 through April 22, 1994 Quark employed Anish Kapadia as a regional sales representative for New York and New Jersey. One of his responsibilities was to solicit orders from resellers for Quark products in his territory. Mr. Kapadia conducted educational sessions at which he informed resellers’ sales personnel of the benefits and features of Quark’s software programs so that they would be better able to sell more inventory to end users. Mr. Kapadia worked out of his personal residence in New Jersey and used his personal car to travel on Quark business.
On or about June 30,1995, the Director began an audit of Quark for CBT purposes. On September 10, 1996, the Director issued a notice of proposed determination for years 1993 through 1995 finding that Quark’s licensing of software to New Jersey customers, while retaining title to such software, constituted “doing business” in New Jersey and required Quark to file a CBT return for those years. On August 25, 1997, the Division issued a notice of assessment and demand for payment in the amount of $250,000 of CBT for years 1993 through 1996. Quark filed a protest with *166 the Director on September 11, 1997. On September 30, 2003, the Director issued a final determination letter finding that Quark is subject to CBT from 1988 through September 30, 2003. Quark timely filed this appeal.

Summary Judgment

The Court finds that the present matters are ripe for summary judgment. New Jersey’s Court Rules provide that summary judgment is appropriate where:
The judgment or order sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law'.
[R. 4:46 — 2(c).]
The moving party sustains the burden to show no genuine issue of material fact exists. Judson v. Peoples Bank and Trust Co., 17 N.J. 67, 74, 110 A.2d 24 (1954). See also Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 916 A.2d 440 (2007). The opposing party cannot defeat the motion for summary judgment simply by pointing to any fact in dispute. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529, 666 A.2d 146 (1995). Denial of summary judgment occurs when the opposing party brings forward evidence that creates a genuine issue for a material fact. Ibid.
Despite the Director’s contention that there is a factual uncertainty which creates an issue of material fact that should cause Quark’s motion for summary judgment to be denied (see discussion under sub-category heading d. P.L. 86-272 infra), the court finds that there is no genuine issue as to any material fact in these matters.

Analysis

The Director’s interpretation of the act and the rules promulgated there under are generally entitled to a presumption of correctness. Her construction of a tax statute, “which is not plainly unreasonable and with which the Legislature has not *167 interfered, is entitled to prevail.” Aetna Burglar & Fire Alarm Co. v. Director, Div. of Taxation, 16 N.J.Tax 584, 589 (1997) (citing Vavoulakis v. Director, Div. of Taxation, 12 N.J.Tax 318, 332 (1992), aff'd 13 N.J.Tax 322 (App.Div.1993)).
A court may reverse an agency’s decision if “(1) it was arbitrary, capricious, or unreasonable; (2) it violated express or implied legislative policies; (3) it offended the State or Federal Constitution; or (4) the findings on which it was based were not supported by substantial, credible evidence in the record.” University Cottage Club of Princeton New Jersey Corp. v. New Jersey Dept. of Envt’l Prot., 191 N.J. 38, 48-49, 921 A.2d 1122 (2007) (citing In re Taylor, supra 158 N.J. at 656, 731 A.2d 35); Shim v. Rutgers, 191 N.J. 374, 384, 924 A.2d 465 (2007).
The presumption afforded the Director’s statutory and regulatory interpretation however, is subject to “the responsibility of the courts to rule on constitutional challenges to a statute.” General Engines Co., Inc. v. Director, Div. of Taxation, 23 N.J.Tax 515, 518 (2007). When considering the constitutionality of a state statute, courts must:
[A]fford every possible presumption in favor of an act of the Legislature. Where alternative interpretations of a statute are equally plausible, the view sustaining the statute’s constitutionality is favored. Only a statute “clearly repugnant to the Constitution” will be declared void.
Further, in the field of taxation, the Court has accorded great deference to legislative judgments. The Court has recognized that absolute equality in taxation is a practical impossibility and that absolute mathematical precision is not required. [Secaucus Town v. Hudson County Bd. of Taxation, 133 N.J. 482, 492-93, 628 A.2d 288 (1993) (citations omitted).]
Accordingly, the Director’s interpretation is not afforded any presumption of correctness with respect to the constitutional challenges to N.J.S.A. 54:10A-2, but will be afforded such a presumption with respect to her interpretation of the statutes as expressed through N.J.A.C. 18:7-1.6.

I. Nexus

The United States Constitution gives Congress the power “tt]o regulate Commerce with foreign Nations, and among the *168 several States, and with the Indian Tribes[.]” U.S. Const. art. I, § 8, cl. 3 (hereinafter “the Commerce Clause”). A state tax law violates the Commerce Clause if it does not satisfy the four-part test established in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.26. 326 (1977). A state may only tax an entity “when [1] the tax is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State.” Id. at 279, 97 S.Ct. at 1079, 51 L.Ed.26 at 331.
The main issue in dispute in these matters is whether there is a substantial nexus between the Corporations and New Jersey to impose a tax based on corporate income without violating the Commerce Clause.
The Act requires in pertinent part that:
Every domestic or foreign corporation which is not hereinafter exempted shall pay an annual franchise tax ... for the privilege of having or exercising its corporate franchise in this State, or for the privilege of deriving receipts from sources within this State, or for the privilege of engaging in contacts within this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State.
A taxpayer’s exercise of its franchise in this State is subject to taxation in this State if the taxpayer’s business activity in this State is sufficient to give this State jurisdiction to impose the tax under the Constitution and statutes of the United States.
[N.J.S.A. 54U0A-2.]
The regulations explain that a foreign corporation will be deemed subject to tax if, among other factors not present in this case, it is “[djoing business in this State” or “[ejmploying or owning property in this State.” N.J.A.C. 18:7-1.6(a)(2). This court will first address whether AccuZIP and/or Quark are doing business in New Jersey. For the reasons set forth below, the court finds that Quark is doing business in New Jersey but AccuZIP is not.
The determination as to whether a corporation is doing business in New Jersey is fact sensitive. The factors to be considered include:
*169 1. The nature and extent of the activities of the corporation in New Jersey;
2. The location of its offices and other places of business;
3. The continuity, frequency and regularity of the activities of the corporation in New Jersey;
4. The employment in New Jersey of agents, officers and employees;
5. The location of the actual seat of management or control of the corporation. Example
Foreign corporation E holds trademarks that were assigned to it by its parent corporation. E receives fees as a result of licensing those trademarks to certain New Jersey companies for use in New Jersey. E is subject to the corporation business tax on its apportioned income as a result of its trademark licensing activities.
[N.J.A.C. 18:7-1.9(b).]
State courts are split as to whether physical presence is necessary to satisfy the substantial nexus requirement. The United States Supreme Court found that physical presence is necessary to satisfy the substantial nexus standard in the sales and use tax context in National Bellas Hess v. Department of Revenue of Illinois, 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967). National Bellas Hess was a Missouri mail-order company incorporated in Delaware that mailed catalogues to customers in Illinois. The Court held that since Bella Hess’ Illinois contacts were limited to communicating with customers by mail as part of a general business interest, it would be a Commerce Clause violation to obligate it to collect and pay use tax. Ibid. The Court reaffirmed this bright-line physical presence standard for sales and use tax twenty-five years later in Quill Corp. v. North Dakota, 504 U.S. 298,112 S.Ct. 1904, 119 L.Ed.2d 91 (1992).
In Lanco, Inc. v. Director, Div. of Taxation, 188 N.J. 380, 908 A.2d 176 (2006), cert. denied, 551 U.S. 1131,127 S.Ct. 2974,168 L.Ed.2d 702 (2007), the Supreme Court of New Jersey affirmed the Appellate Division’s finding that the bright line rule established in National Bellas Hess, requiring a physical presence in the taxing state in order to create a sufficient nexus, was limited to sales and use tax and was unnecessary to impose CBT liability. Lanco was a Delaware corporation that owned intangible personal property (trademarks, trade names, and service marks) that it licensed to Lane Bryant, Inc. pursuant to a long-term contract for that company’s retail operations, which included operations in *170 New Jersey. Lanco, Inc. v. Director, Div. of Taxation, 379 N.J.Super. 562, 879 A.2d 1234 (App.Div.2005). In return, Lanco received royalty payments and licensing fees. Ibid. The Appellate Division found Lanco had a substantial nexus, and held that the New Jersey CBT “may be constitutionally applied to income derived by plaintiff from licensing fees attributable to New Jersey.” Id. at 647, 879 A.2d 1234. The court gave great weight to the fact that the company was licensing intangible property. In doing so it relied on a North Carolina Court of Appeals decision finding that:
[W]e reject the contention that physical presence is the sine qua non of a state’s jurisdiction to tax under the Commerce Clause for purposes of income and franchise taxes. Rather, we hold that under facts such as these where a wholly-owned subsidiary licenses trademarks to a related retail company operating stores located within North Carolina, there exists a substantial nexus with the State sufficient to satisfy the Commerce Clause. Accord Geoffrey, [Inc. v. South Carolina Tax Com’n, 313 S.C. 15,] 437 S.E.2d [13] at 18 (holding that “by licensing intangibles [to Toys ‘R Us, an affiliated operating store,] for use in [South Carolina] and deriving income from their use [t]here, Geoffrey ha[d] a ‘substantial nexus’ with South Carolina”); Kmart [Properties, Inc. v. Taxation and Revenue Dep’t of New Mexico, 2006 NMCA 26, 131 P.3d 27, 33, 2001 N.M.App. LEXIS 133] (N.M.Ct.App., 2001) (holding that “the use of KPI’s [the wholly-owned trademark holding company licensor] marks within New Mexico’s economic market, for the purpose of generating substantial income for KPI, established] a sufficient nexus between that income and the legitimate interests of the state and justified] the imposition of a state income tax”).
[Id. at 646, 879 A.2d 1234 (quoting A&F Trademark, Inc. v. Tolson, 167 N.C.App. 150, 605 S.E.2d 187 (2004)).]
Subsequently, New Jersey Courts have “take[n], as a given, the substantive rule underlying the decision in Lanco, that the State may tax income generated in the State by intangible property, even where the assessed corporation, itself, lacks a physical presence in the State.” Praxair Tech., Inc. v. Director, Div. of Taxation, 404 N.J.Super. 287, 291, 961 A.2d 738 (App.Div.2008), appeal pending, Docket No. 63,664 (N.J.Sup.Ct.)

a. Tangible vs. Intangible Property

The Director argues that Quark and AccuZIP are similarly situateribto Lanco because both are licensing intangible property, as evidenced through licensing agreements. Quark and AccuZIP *171 argue that they are selling tangible personal property distinct from the actions in Lanco.
For sales and use tax purposes New Jersey recognizes that “[tjangible personal property includes ... prewritten computer software including prewritten computer software delivered electronically.” N.J.S.A. 54:32B-2(g). The term “Prewritten Computer Software” is defined as “computer software, including prewritten upgrades, which is not designed and developed by the author or other creator to the specifications of a specific purchaser.” N.J.S.A. 54:32B-8.56.
Federal law treats the sale of prewritten software as tangible property even if the parties characterize the transaction as a license:
Neither the form adopted by the parties to a transaction, nor the classification of the transaction under copyright law, shall be determinative. Therefore, for example, if there is a transfer of a computer program on a single disk for a onetime payment with restrictions on transfer and reverse engineering, which the parties characterize as a license (including, but not limited to, agreements commonly referred to as a shrink-wrap licenses) .. the transaction [may be] classified as the sale of a copyrighted article.
[Treas. Reg. § 1.861-18(g)(l).]
The United States Treasury Regulations provide an example that is almost identical to the activities of Quark and AccuZIP in which it concludes the transaction is a sale of a copyrighted article:
Corp A, a U.S. corporation, owns the copyright in a computer program, Program X. It copies Program X onto disks. The disks are placed in boxes covered with a wrapper on which is printed what is generally referred to as a shrink-wrap license. The license is stated to be perpetual. Under the license no reverse engineering, decompilation, or disassembly of the computer program is permitted. The transferee receives, first, the right to use the program on two of its own computers (for example, a laptop and a desktop) provided that only one copy is in use at any one time, and, second, the right to make one copy of the program on each machine as an essential step in the utilization of the program. The transferee is permitted by the shrink-wap license to sell the copy so long as it destroys any other copies it has made and imposes the same terms and conditions of the license on the purchaser of its copy. These disks are made available for sale to the general public ... In return for valuable consideration, P ... receives one such disk. [Treas. Reg. § 1.861 — 18(h) (Example 1).]
In this example, the transaction is viewed as the “sale of a copyrighted article rather than the grant of a lease.” Ibid.
*172 The treasury regulations provide a similar example that provides specific guidance as to Quark’s business:
Corp C, a distributor in Country Z, enters into an agreement with Corp A, a U.S. corporation, to purchase as many copies of Program X on disk as it may from time-to-time request. Corp C will then sell these disks to retailers. The disks are shipped in boxes covered by shrink-wrap licenses (identical to the license described in Example 1).
[Treas. Reg. § 1.861 — 18(h) (Example 7).]
In this example as well, the transaction is viewed as the sale of a copyrighted article and the “use of the term license is not dispositive.” Ibid.
Although not bound by the Internal Revenue Code or the treasury regulations, “[m]ethods used by the Internal Revenue Service for tax purposes may serve as useful guidelines” for this court. Westfield Ctr. Serv. v. Cities Serv. Oil Co., 86 N.J. 453, 466, 432 A.2d 48 (1981). See also R.C. Maxwell Co. v. Township of Galloway, 145 N.J. 547, 555, 679 A.2d 141 (1996) (where the New Jersey Supreme Court, on appeal from the Tax Court, used the definition of “tangible personal property” found in a federal treasury regulation to determine the New Jersey Legislature’s intent of N.J.S.A. 54:4-1); Pioneer Potato Co. v. Division of Employment Sec., 17 N.J. 543, 111 A.2d 888 (1955).
Accordingly, this court finds that AccuZIP and Quark sell tangible copyrighted property in the form of CD-ROMs containing prewritten computer software. Their fees are generated from the single sale of their products and requested updates (for AccuZIP), and not from any resale or royalty payments. AccuZIP and Quark are not generating income from the use in New Jersey of their intangible personal property, as was the case with the trademarks and trade names at issue in banco. The present matters are further distinguishable from banco in that AccuZIP and Quark are not affiliated with a corporation that has a physical presence in New Jersey; neither of the Corporations’ intellectual property is displayed in New Jersey store locations to generate sales; and, neither of the Corporations receives royalty payments or licensing fees for its products. Furthermore, Quark and Accu *173 ZIP are actual corporations and not holding companies created for the purpose of generating a tax benefit.[2]
The present matters are also distinguishable from the line of sales and use tax eases that apply the “real object test” to differentiate between computer information and the medium by which that information is sent. See, Spencer Gifts, Inc. v. Director, Div. of Taxation, 182 N.J.Super. 179, 3 N.J.Tax 482, 440 A.2d 104 (1981); Fingerhut Products Co. v. Revenue Comm’r., 258 N.W.2d 606 (Minn.1977); Janesville Data Center, Inc. v. Wisconsin Rev. Dept., 84 Wis.2d 341, 267 N.W.2d 656 (1978). In Spencer, supra, the plaintiff leased magnetic tapes containing lists of names and addresses with specific characteristics that were added to advertising wrappers for Spencer’s mailing catalogs. The issue before that court was whether the leasing of the information on the tapes was the leasing of tangible personal property subject to the sales and use tax. The Spender court found that
[w]hile the magnetic tapes, by which the information which is the subject of the leasing transaction is transmitted, can be touched and felt and take up space for storage, the tapes are only the method used to transfer the information or the conduit by means of which the information is transmitted from the lessor to the lessee.
[Spencer, supra 3 N.J.Tax at 501, 440 A.2d 104].
Furthermore, the Spencer court distinguished the term software from the terms information and data. It defined software as, “a set of computer programs, procedures, and possibly associated documentation concerned with the operation of a data processing system; e.g., compilers, library routines, manuals, circuit diagrams.” Id. at 502, 440 A.2d 104 (citing Davis, Information Processing Systems 489 (2 ed. 1981)). The terms information and data were defined as follows:
*174 Information may be defined as knowledge, especially as it provides people (or machines) with new facts about the real world. Data may be defined as physical symbols used to represent information for storage, communication, or processing. To determine what data to use, it is important to decide what information the data is to represent.

mm

The court found the distinction between software and information important and stated that, “software eases are applicable by-analogy but are not completely dispositive of the issue before this court. However, cases which deal with information are directly applicable.” Id. at 503, 440 A.2d 104. The Spencer court ultimately concluded that:
Plaintiff is not subject to sales or use tax when it leases mailing lists. The leasing of computer information is not the leasing or sale of tangible personal property and is not taxable under our act.
Plaintiff is leasing information. It is not leasing tangible personal property. The tapes which are tangible personal property and which transmit the information are only incidental to the underlying transaction between the parties. The tapes are an inconsequential part of the transaction whose real object is the obtaining of mailing list information. In fact, the parties stipulated that it is possible to dispense with the delivery of tapes altogether and to transmit the mailing list information by telephone from one computer to another. Under such circumstances the form of delivery of the information should not control its taxability. The inconsequential aspect of the magnetic tapes in the subject transactions may be compared to the inconsequential aspect of the paper used in connection with an accountant’s services by way of reports or with an attorney’s services by way of wills, other legal documents or letters giving advice.
Since the real object of the transaction involves intangible personal property, it is not taxable under those provisions of our act dealing with tangible property. [Id. at 507-08, 440 A.2d 104 (citations omitted).]
The CD-ROMs used by AccuZIP and Quark do not contain information that can be printed out and used just as effectively as if it were in the computer. Although AccuZIP and Quark could write down its computer code on a piece of paper and hand it to customers rather than selling it on a disk, such a practice would be impractical. The real object of the transaction is not to obtain the computer code. With AccuZIP, for example, customers would most likely not even be able to convert the linear code into a useful product. The customer is purchasing software that is used to sort mail. This interpretation is compatible with N.J.S.A. 54:32B-2(g) defining tangible personal property to include “prewritten computer software including prewritten computer software *175 delivered electronically.”[3] AccuZIP and Quark are selling software, not information.

b. Owning Property in New Jersey

Director next argues that Quark and AccuZIP satisfy the substantial nexus requirement because the language in their licensing agreements evidence ownership of property (copyrighted software) in New Jersey. 17 U.S.C.A. § 202, entitled “Ownership of copyright as distinct from ownership of material object” states that:
Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object. '

[Ibid.] '

The Director correctly asserts that copyright law protects the plaintiffs’ software irrespective of the licensing agreement. All parties also agree that, “[tjhere can be no doubt that a copyright owner can assign separately to whomsoever he may desire one or more of the sum of the separable rights which together make up the copyright property.” Goldsmith v. Commissioner, 143 F.2d 466, 467 (2d Cir.), cert. denied, 323 U.S. 774, 65 S.Ct. 135, 89 L.Ed. 619 (1944) (citing Photo-Drama Motion Picture Co. v. Social Uplift Film Corp., 220 F. 448 (2d Cir. 1915)). It follows that when a copyright owner retains ownership of the copyright to itself “the assignee does not become the owner of the copyright itself and acquires only what lesser rights are granted by the terms of the assignment.” Ibid, (citing Goldwyn Pictures Corp. v. Howells Sales Co., 282 F. 9 (2d Cir.1922)).
The Director argues that if the Corporations’ copyrighted property was limited to the source code[4] located in the Corporations’ *176 respective state, then licensees of their software in New Jersey would receive unencumbered title to the software embodied in the disk as well as the copyright to the software. However since the licensing agreements preclude end users from modifying, translating, reverse engineering, disassembling, or decompiling the software, then, the Director contends, Quark and AccuZIP retain title to the software in New Jersey and therefore own property in the state.
The Copyright Act of 1976 provides that a copyright owner has the right to do and authorize the following: “(1) to reproduce the copyrighted work in copies ... (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending[.]” 17 U.S.C. § 106. When a copyright holder transfers a copyrighted disk it does not transfer any of the owner’s § 106 rights. The United States Tax Court ruled on this issue in Norwest Corp. v. Commissioner, 108 T.C. 358, 1997 WL 211303 (1997). Norwest purchased software stored on a disk for use with its banking business. The software was subject to license agreements and could be used on a nonexclusive, nontransferable basis. The court found that “purchaser of a particular tangible manifestation or embodiment of intellectual property acquires only property rights in that manifestation or embodiment and does not acquire any rights to the underlying intellectual property.” Id. at 375. Although the Norwest decision dealt with the Investment Tax Credit, “[rjesolution of that issue depended] on the characterization of the acquired software as either tangible or intangible property----” Id. at 359.
Quark and AccuZIP are selling copies of its copyrighted work to the public in accordance with its § 106 rights. The licensing agreement is used because computer programs are susceptible to mutilation (books and CDs contain similar copyright provisions). The agreement puts customers on notice that AccuZIP and Quark are not selling ownership of its intellectual property. Rather, the buyer receives ownership of the physical property containing the intellectual property for its own use. This does not mean that Quark and AccuZIP own property in New Jersey; such a finding *177 would lead to illogical results. If the location of the physical disks evidenced a substantial nexus for CBT purposes then the customers would determine Quark’s and AccuZIP’s CBT fate. If all of the customers moved to another state with their disks then, under the Director’s argument, Quark and AccuZIP would not own property in New Jersey and would potentially be liable for tax to another state. Surely this is not what New Jersey’s Legislature intended in enacting the Act.

e. Doing Business in New Jersey

Based upon the foregoing analysis, the court concludes that AccuZIP sells tangible property and does not own property in this state. Furthermore, the nature and extent of AccuZIP’s activities in New Jersey, as well as the continuity, frequency and regularity of those activities, are diminimus. AeeuZIP’s sales in New Jersey generate only $64,744 which amounts to just 2% of its total gross income. Additionally, AccuZIP has no agents, officers, or employees in New Jersey, and its seat of management, offices, and other places of business are not located in New Jersey.
Accordingly, the court finds that AccuZIP is not doing business in New Jersey and there is not a substantial nexus between AccuZIP and New Jersey for the Director to impose a tax based on AccuZIP’s corporate income. The Director’s interpretation of the law and regulations with regard to AccuZIP is not supported by the record and therefore cannot prevail. University Cottage Club of Princeton New Jersey Corp., supra, 191 N.J. at 48-49, 921 A.2d 1122; Shim, supra, 191 N.J. at 384, 924 A.2d 465.
While the court also concluded above that Quark sells tangible property and does not own property in this state, Quark employed a regional sales representative in New Jersey from August 1, 1992 until April 22, 1994. Mr. Kapadia traveled to stores in New Jersey that sold Quark’s products, and held educational sessions. As such, Quark was “doing business” in New Jersey pursuant to N.J.A.C. 18:7 — 1.9(b)(4) (i.e. “The employment in New Jersey of agents, officers and employees”) from 1992 through 1994. However, Quark’s activities in New Jersey must be *178 further examined (see, sub-category heading d. P.L. 86-272 infra) to determine if they are “protected” and therefore subject only to a minimum tax, or “unprotected”, subjecting it to tax based on income.

d. 86-272 P.L.

15 U.S.C. § 381 (commonly referred to as “P.L. 86-272”) provides that no state may impose a net income tax on a person from interstate commerce if the only business activities within the State are:
[T]he solicitation of orders by such person, or his representative, in such State for sale of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State. [15 U.S.C. 381(a)(1).]
New Jersey’s regulations provide guidance as to the kind of activities that fall within the safe harbor:
1. For the in-State activities of the foreign corporation to immunize the corporation from taxation measured by income, such activities must be limited solely to:
i. Speech or conduct that explicitly or implicitly invites an order; and
ii. Activities that neither explicitly nor implicitly invite an order but that are entirely ancillary to requests for an order.
2. Examples of additional activities or contacts with New Jersey that will subject a corporation to the tax based on or measured by income are:
i. Repairs, maintenance, and installations;
ii. Collection or repossession activities;
iii. Credit investigations;
iv. Personnel courses or lectures;
v. Technical assistance;
vi. Customer complaint resolution if the sole purpose is not to ingratiate sales personnel with the customer;
vii. Approving or accepting orders or securing deposits on sales;
viii. Acquiring personnel for other than solicitation activities;
ix. Maintaining a display at a single location in excess of two weeks during the tax year;
x. Carrying samples for sale, exchange or distribution in any manner for consideration or other value;
xi. Owning, leasing, or maintaining in-state facilities such as a warehouse or answering service; and
xii. Consignment of personal property
*179 3. Examples of additional activities which together with the solicitation activities described in (d)l above will not subject a corporation to tax based on or measured by income are:
i. Solicitation of orders through advertising,
ii. Carrying samples for display or distribution without charge;
iii. Providing automobiles, owned or leased, registered or not registered in New Jersey, to sales personnel for their use in conducting protected activities;
iv. Checking customer inventories without charge;
v. Maintaining a display at a single location for less than two weeks during the tax year;
vi. Recruitment, training, or evaluation of sales personnel;
vii. A sales employee’s in-home work space that is not paid for by the company, and
viii. Mediating customer complaints if just to ingratiate sales personnel with the customer.
[N.J.A.C. 18:7 — 1.9(d).]
A corporation whose New Jersey activities are limited to the above activities is considered to be “doing business” in New Jersey, but will only be liable for filing a return and payment of the minimum tax and will not be liable for any tax measured on the income of the corporation. Pomco Graphics v. Director, Div. of Taxation 13 N.J.Tax 578, 584 (1993).
The court will separately analyze P.L. 86-272 with regard to AccuZIP and Quark because the factual differences of their cases require separate treatment on this issue.

1. AccuZIP

The court determined above that AccuZIP was not doing business in New Jersey and therefore an analysis under P.L. 86-272 as to AccuZIP is not required. However, assuming arguendo that AccuZIP was found to be doing business in New Jersey, the court finds that AccuZIP will nevertheless not be liable for any tax measured on the income of the corporation, but rather would be subject only to the minimum tax pursuant to N.J.S.A. 54:10A-5, since its business activities in New Jersey would fall under the protections of P.L. 86-272.
Director argues that AccuZIP’s business activities fall outside the protections of P.L. 86-272 because it continued to own the software it licensed pursuant to the provisions of the licensing *180 agreement. She cites an opinion of the Multistate Tax Commission (hereinafter “the MTC”) which provides that:
Only the solicitation to sell personal property is afforded immunity under P.L. 86-272 ... [and] ... the licensing ... of tangible personal property, or transactions involving intangibles, such as franchises, patents, copyrights, trade marks, sendee marks and the like, or any other type of property are not protected activities under P.L. 86-272.
[Statement of Information Concerning Practices of Multistate Tax Commission and Signatory States Under Public Law 86-272, Article I (2001) at http://www.mtc. gov/uploadedfiles/multistate_tax_commission/uniformity/uniformity_projects/a_-_z/ statementofinfopubliclaw86-272.pdf.] (last visited August 6, 2009).
The Director is correct to point out that New Jersey is only a Sovereignty Member of the MTC and is not bound by the group’s position as would be required for a Compact Member. She argues, however, that there is no aspect of the MTC’s position that she disagrees with.
The Director may not informally adopt the MTC’s rules without notice. Under the New Jersey Administrative Procedures Act (hereinafter “the APA”), an agency decision requires rulemaking if the new rule:
(1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future eases, that is prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rale, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.
[Metromedia v. Director, Div. of Taxation, 97 N.J. 313, 331-32, 478 A.2d 742 (1984).]
These factors can “either singly or in combination, determine in a given ease whether the essential agency action must be rendered through rule-making or adjudication.” Id. at 332, 478 A.2d 742. In this case the Director’s determination would have a wide coverage as it would apply to all out of state companies that license tangible personal products or intangibles such as copyrights and trademarks. The policy has not been previously expressed and would be contrary to N.J.S.A. 54:32B. If the Di *181 rector wants to adopt the MTC’s position of P.L. 86-272 she must do so formally.
If this court was to accept the Director’s position as being authoritative, AccuZIP’s activities would still fall within the protections of P.L. 86-272. As previously discussed above, Treasury Regulation § 1.1861-18(a)(3) provides that the sale of prewritten software is a sale of a tangible product even though it may be characterized as a licensing agreement. In conducting its sales activities, AccuZIP placed advertisements in national trade magazines and maintained a web page. These activities alone do not satisfy the solicitation prong of the P.L. 86-272 test. See Millennium Enters., Inc. v. Millennium Music, LP, 33 F.Supp.2d 907, 914 (D.Or.1999) (holding that an internet website did not constitute solicitation for personal jurisdiction purposes because “[u]n-like newspaper, mailing, radio, television and other media containing advertisements and solicitations, most Internet advertisements and solicitations are not directed at [sic] specific geographic areas or markets; to the contrary, advertising on the Internet targets no one in particular and everyone in particular in any given geographic location”). AccuZIP never had an employee physically present in New Jersey to solicit business. All orders were placed by telephone, e-mail, or fax and confirmed by AccuZIP employees in California. The software was shipped to customers by common carrier.
Had this court concluded that AccuZIP was doing business in New Jersey, then in the court’s view AccuZIP’s business activities in New Jersey would be nothing more than mere solicitation. As such, AccuZIP would be afforded the protections of P.L. 86-272 and would only be subject to the minimum tax pursuant to N.J.S.A. 54:10A-5.

2. Quark

The Director argues that the activities performed by Quark’s regional sales representative went beyond mere solicitation and are thus outside of the protection of P.L. 86-272. According to the Director, Mr. Kapadia (on behalf of Quark) gave dealers demo disks that contained software “which allowed them *182 to install and play around with it (i.e., the software).” Final Joint Stipulation of Facts Ex. H. p. 31. These demo disks would only work for a limited time. Depending on the amount of time the dealers could use the demo disks, Quark may have maintained a sample in excess of fourteen days at any one location within New Jersey. The Director claims that these facts evidence more than solicitation in accordance with the MTC’s guidance. In particular the MTC provides that “maintaining a sample or display room in excess of two weeks (14 days) at any one location within the state during the tax year” is an unprotected activity (out of the realm of 86-272 protection). Statement of Information Concerning Practices of Multistate Tax Commission and Signatory States Under Public Law 86-272, Article IV(A)(14) (2001) at http://www.mtc. gov/uploadedfiles/multistate_tax_commission/uniformity/ uniformity_projeets/a_-_z/statementofinfopubliclaw86-272.pdf. (last visited August 6, 2009). The Director contends that at the very least, this factual uncertainty creates an issue of material fact that should cause Quark’s motion for summary judgment to be denied.
The court rejects this contention. Even if the demo disks were retained for at least fourteen days, the court finds this would not constitute the type of activity contemplated by N.J.A.C. 18:7-1.9(d)(2)(ix) (which subjects a corporation to tax measured by income if it maintains a display at a single location in excess of two weeks during the year). This court is not convinced that giving a demo disk to a dealer to “play around with,” rises to the level of maintaining a display. Rather, the court is satisfied that the demo disks were simply a convenience for the dealers to become comfortable with the system and better inform the end user about the product, and were not a means by which Quark established situs in New Jersey. There is no evidence that any customer would come into contact with, or be able to view the disks. Furthermore, even when giving greater deference to the Director’s argument, the demo disks would at best be a de minimis addition to Quark’s business in New Jersey, and would not rise to the level of a material fact in dispute for summary judgment purposes.
The Director further argues that Mr. Kapadia’s activities are comparable to those in Clairol, Inc. v. Kingsley, 109 N.J.Super. *183 22, 262 A.2d 213 (App.Div.), aff'd, 57 N.J. 199, 270 A.2d 702 (1970), app. din., 402 U.S. 902, 91 S.Cl. 1377, 28 L.Ed.2d 643 (1971). Clairol was a Delaware cosmetic company that employed representatives in New Jersey to visit retail druggists and re-arrange promotions or create counter displays. The employees also took inventory of the store’s stock of Clairol products and then wrote up a suggestive order that the buyer would call in or allow the representative to mail in to the wholesaler. Id. at 29, 262 A.2d 213. In addition Clairol had representatives with a technical background that would call on beauty salons that purchase its products to instruct the salon employees on how to use the products. Id. at 30, 262 A.2d 213. The court found that Clairol’s business activities in New Jersey went beyond solicitation of orders because:
That increased public favor of Clairol’s products will eventually result in increased orders from retail druggists to wholesalers and from wholesalers to Clairol, or as in the case of its hair products from beauty salons to “beauty jobbers” and from the latter to Clairol, does not blanket all Clairol’s activities with the protection afforded by the federal act to cases where the only business activity of the taxpayer is the solicitation of orders.

[Ibid.]

Clairol is distinguishable from the present matter. Where Clairol’s activities were post-sale in nature, Quark’s solicitation was pre-sale. Quark’s conduct did not serve a business purpose outside of the solicitation of orders. If an end user contacted Mr. Kapadia he declined to offer assistance and referred them to Quark’s technical support department. If a dealer contracted Mr. Kapadia with a problem he would attempt to “help out.” However, if the problem was technical or if the dealer needed product support Mr. Kapadia would refer them to the Quark dealer service line in Colorado. Mr. Kapadia did not perform many of the responsibilities entrusted to Clairol’s employees. At no time did he take inventory of a dealer’s stock of Quark products, nor did he make suggestions to dealers as to the type or amount of product a dealer should order.
As defined by the United States Supreme Court, solicitation for purposes of P.L. 86-272 includes all verbal and written requests for orders and anything ancillary to the requests for purchases that serves no independent business function. Wisconsin Dep't of *184 Revenue v. William Wrigley, Jr., Co., 505 U.S. 214, 228-29, 112 S.Ct. 2447, 2456,120 L.Ed.2d 174,189 (1992). It includes “not just explicit verbal requests for orders, but also any speech or conduct that explicitly invites an order.” Id. at 223, 112 S.Ct. at 2453-54, 120 L.Ed.2d at 186. In Wrigley, representatives handed out promotional materials, free samples, and directly requested orders for Wrigley products. In addition Wrigley’s representatives would perform “agency stock checks”, where they provided free display racks to retailers. If a retailer needed gum to fill the new rack the representative would fill them with gum from their ear. Further, Wrigley’s sales representative would cheek the retailer’s stock of gum for freshness and replace stale gum at no cost. The three activities in Wrigley that exceeded the protection afforded by P.L. 86-272, were “the replacement of stale gum by sales representatives; the supplying of gum through ‘agency stock cheeks’; [and] the storage of gum____” Id. at 232, 112 S.Ct. at 2458, 120 L.Ed.2d at 191. The Court held that these activities served “an independent business function quite separate from requesting orders” and stated that, “it is not enough that the activity facilitate sales; it must facilitate the requesting of sales ....” Id. at 233, 112 S.Ct. at 2458-59, 120 L.Ed.2d at 192.
The facts of Wrigley are also distinguishable from Quark. Quark’s conduct within New Jersey does not serve an independent business function. Unlike the agency stock checks in Wrigley, the demo disks came at no cost to the dealers. Further, the disks were valueless, as they were only operational for a limited period of time. Moreover, Mr. Kapadia did not perform agency stock checks, pick up or replace any damaged computer software, or return any software to Quark. Absent these similarities, or other facts showing conduct beyond mere solicitation, Mr. Kapadia’s distribution of valueless demo disks to prospective dealers does not rise to an independent business function. Rather, the demo disks facilitated request of sales, and were a part of Mr. Kapadia’s verbal and written requests for orders.
The Wrigley court commented that Clairol does not stand for the proposition that P.L. 86-272 is to have a narrow construction:
Though Clairol is frequently cited for this [narrow] construction, the opinion in the case does not in fact recite it____ The judgment in Clairol would have been the *185 same even under a broader construction of “solicitation of orders” since the company’s in-state activities included sending nonsales representatives to provide customers technical assistance in the use of Clairol products.
|Id. at 224, 112 S.Ct at 2454,120 L.Ed.2d at 186.]
This broader reading of P.L. 86-272 was applied in Pomco Graphics, supra, 13 N.J.Tax 578. Pomco was a Pennsylvania corporation that maintained a sales force that visited customers in New Jersey and conducted product presentations. Ibid. The presentations included display and review of samples of printed material prepared by Pomco for other customers, review of proposed content and layout of the work to be done for the customer, and discussion of price, quantities, and schedules. Id. at 582. The court held that:
A product presentation meeting certainly occurs prior to the placing of orders and the activities objected to were unquestionably speech and conduct that explicitly invited orders. The term “solicitation” includes the entire process associated with inviting an order and a salesman’s product presentation meeting is “part of the solicitation of orders; because the only reason to do it is to facilitate requests for purchases.” ... [A]U of Pomco’s New Jersey activities ... are entirely ancillary to request for purchases-those that serve no independent business function apart from their connection to the soliciting of orders, and they are not activities that Pomco would have reason to engage in anyway but chose to allocate to its in-state sales force.
[Id. at 593 (citing Wrigley, supra, 505 U.S. at 229, 112 S.Ct. at 2457, 120 L.Ed.2d at 189-90).]
The record demonstrates that all of Mr. Kapadia’s activity conducted in New Jersey furthered the solicitation of orders for Quark’s disks. His education sessions were of a pre-sale nature. He was not educating the end user, but rather the retail seller. The sessions had no independent business function apart from the solicitation of orders and are not activities that Quark would have reason to engage in anyway. Director’s argument that relies on the MTC is again faulty because New Jersey is not an MTC Member State and has never adopted the MTC compact. The activities fall within the protection of P.L. 86-272 and subject Quark to the minimum tax pursuant to N.J.S.A. 54:10A-5 for the years that Mr. Kapadia was employed as a sales representative in New Jersey.

d. Alternative Nexus Arguments

The Director made two alternative nexus arguments:

*186
1. Significant Economic Presence Test

The Director urges this court to adopt the significant economic presence test to determine whether a substantial nexus exists for Commerce Clause purposes. This analysis is based on the “frequency, quantity, and systematic nature of a taxpayer’s economic contacts with a state.” Tax Comm’r v. MBNA Am. Bank, N.A., 220 W.Va. 163, 640 S.E.2d 226, 234 (2006) (citation omitted), cert. denied 551 U.S. 1141, 127 S.Ct. 2997, 168 L.Ed.2d 719 (2007). MBNA was a Delaware corporation with no property or employees in West Virginia. Its business consisted of issuing and servicing VISA and MasterCard credit cards. MBNA promoted itself in West Virginia through mail and telephone solicitation. The Supreme Court of Appeals of West Virginia adopted the economic presence test, citing its need in the growth of technology and electronic commerce, and found that the bank satisfied the substantial nexus standard. In his dissenting opinion Justice Benjamin noted that, “[t]he jurisprudential reality is that the United States Supreme Court has never held in any state tax case that the nexus requirements of the Commerce Clause can be satisfied in the absence of a taxpayer’s physical presence in the taxing state.” Id. at 239.
The significant economic presence test applied in MBNA is not binding on this court. Moreover, New Jersey has a sufficient body of law, in conjunction with relevant federal law, to address the issues now before the court.[5]

2. Economic Benefit

The Director asserts that the tax in dispute is fairly related to sendees that result in an economic benefit to AccuZIP[6] from the *187 use and employment of its property in New Jersey. The Director argues that the justification for the CBT is the recovery of New Jersey’s expense of providing judicial services to protect the copyright and intellectual property rights, which in turn creates a marketplace for the licensing of software. Although AccuZIP may receive a slight benefit from New Jersey’s judicial system, that alone does not satisfy the substantial nexus requirement. Every corporation that sells a product in New Jersey is not subject to the CBT simply because it receives the benefit of New Jersey Court protection.

II. Internal Consistency Test

Since it was determined above that Quark is subject to the minimum tax under the P.L. 86-272 analysis, it is not necessary for the court to address Quark’s contention that the Director’s application of the apportionment formula violates the internal consistency test of the Commerce Clause.[7]

Conclusion

For the foregoing reasons, the court finds that Quark and AccuZIP (1) sell tangible copyrighted CD-ROMs containing prewritten software and not intangible personal property; (2) do not own property in New Jersey; and (3) do not derive a substantial economic benefit from New Jersey. Furthermore, the court finds that the significant economic presence test has not been adopted by New Jersey and is therefore not binding.
For AccuZIP, these findings (as well as the additional findings in sub-section I. b. Doing business in New Jersey, infra) lead to the conclusion that it is not doing business in New Jersey and therefore does not satisfy the substantial nexus requirement of the *188 Commerce Clause in order for the Director to impose a tax based on AccuZIP’s corporate income.[8]
For Quark, the court finds that, although it is doing business in New Jersey, the activities of its regional sales representative fall within the protection of P.L. 86-272 and subject Quark only to the minimum tax pursuant to N.J.S.A. 54:10A-5 for the years that Mr. Kapadia was employed as a sales representative in New Jersey.
Accordingly, summary judgment is granted in favor of AccuZIP. As to Quark, summary judgment is granted in part and denied in part. The Director's motion as to AccuZIP is denied; but her motion as to Quark is granted in part and denied in part.
The Tax Court Administrator/Clerk is directed to enter judgment consistent with this opinion.

 The order fulfillment center was located in Colorado up until 1996 and Wyoming thereafter.

 Intangible holding companies such as the ones present in Lanco are commonly incorporated in states that do not have income tax. “This tax avoidance structure effectively transfers otherwise taxable income from the in-state company to the affiliated out-of-state holding company tax-free. The in-state company generally transfers trademarks to its affiliate, which in turn, licenses the trademarks or other intangible property back to the in-state company.” Megan A. Stombock. Economic Nexus and Nonresident Corporate Taxpayers: How Far Will it Go?, The Tax Lawyer 1225, 1233 (2008) (citation omitted).

A 2006 amendment to the statute added the words "including prewritten computer software delivered electronically." The amendment took place after the tax years in question but has no consequence as to this analysis.

 Source code is a lengthy series of computer commands written in a human readable computer programming language known as "C.”

 The court notes that both Lanco and MBNA were decided about the same time; the former on October 12, 2006 and the latter on November 21, 2006.

 Although the Director does not make this same argument with regard to Quark, the court finds that both the argument and the determination of the same would be identical as to AccuZIP and Quark.

 The purpose of the second prong of the Complete Auto Transit test (fair apportionment) is "to ensure that each State taxes only its fair share of an interstate transaction.” New Jersey Natural Gas Co. v. Director, Div. of Taxation, 24 N.J.Tax 59 (2008) (citing Oklahoma Tax Comm’n v. Jefferson Lines, Inc., 514 U.S. 175, 184-85, 115 S.Ct. 1331, 1338, 131 L.Ed.2d 261, 271 (1995)) (citing Goldberg v. Sweet, 488 U.S. 252, 260-61, 109 S.Ct. 582, 588, 102 L.Ed.2d 607, 616(1989)).

 However, had the court concluded that AccuZIP was doing business in New Jersey, then its business activities would fall within the protections of P.L. 86-272 and AccuZIP would only be liable for the minimum tax pursuant to N.J.S.A. 54:10A-5.