NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

_____

|  |  |  |
|---|---|---|
| STANISLAUS FOOD PRODUCTS COMPANY, | : | TAX COURT OF NEW JERSEY |
|  | : | DOCKET NO: 011050-2017 |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| vs. | : |  |
|  | : |  |
| DIRECTOR, DIVISION OF TAXATION, | : |  |
|  | : |  |
| Defendant. | : |  |

_____

Decided: April 22, 2021

Leah Robinson for Plaintiff (Mayer Brown LLP for Plaintiff, attorneys).

Michael J. Duffy for Defendant (Gurbir S. Grewal, Attorney General of New Jersey, attorney).

CIMINO, J.T.C.

## I.     __INTRODUCTION__

Congress enacted the Interstate Income Act of 1959, Pub. L. No. 86-272, 73 Stat. 555 (codified at 15 U.S.C. §§ 381-384) (P.L. 86-272) to preclude the states from imposing a net income tax on certain out-of-state sellers of tangible goods. In New Jersey, this net income tax would be the Corporation Business Tax (CBT). The

-1-

Director does not dispute that the taxpayer here is an entity covered by P.L. 86-272 for the years at issue.

While taxpayer is not subject to the CBT, the Director argues that the taxpayer is subject to the Alternative Minimum Assessment (AMA) (L. 2002, c. 40, § 7), which, for the time period at issue, imposes either a gross receipts or profits tax exclusively upon P.L. 86-272 entities. To be clear, no entities are subject to the AMA except those protected by P.L. 86-272. The Director argues that he is merely imposing the AMA and is not forcing any P.L. 86-272 entity to pay a net income tax, such as the CBT. The taxpayer argues that the AMA is merely an end-run around P.L. 86-272. Both parties moved for summary judgment on this issue.

On the surface, this matter appears to be an esoteric tax issue involving two obscure taxation statutes: one federal and one state. However, wrapped inside is a weighty Constitutional issue. While this court is called upon to particularly decide the interplay between the two statutory provisions, the overriding issue is the competing roles of the state and federal governments.

A long time ago, New Jersey ratified the United States Constitution and agreed to a method of resolving disputes between the state and federal governments. Facing a trade war amongst the states, a constitutional convention was called in 1786. The convention culminated in the adoption of the United States Constitution which was ratified by New Jersey on December 18, 1787. The Constitution provided

what has come to be known as the Commerce Clause which gives Congress the ability to determine the parameters for interstate commerce. To prevent the states from undercutting the dictates of Congress, through competing legislation or otherwise, the Constitution also contains the Supremacy Clause which provides legislation that is within the realm of Congress supersedes the conflicting will of a state legislature. To give the Supremacy Clause some teeth, the framers of the Constitution explicitly provided that state court judges must adhere to the Supremacy Clause.

Here the issue boils down to whether the AMA stands as an obstacle to the accomplishment and execution of the purposes and objectives of P.L. 86-272. While some may argue it is time for Congress to revisit P.L. 86-272 on policy grounds, it is not the role of the court to make that policy determination. The court is duty-bound to faithfully obey the constitutional framework spelled out by the Supremacy Clause and the Commerce Clause. For the reasons set forth in much greater detail in this opinion, the court determines that the AMA is being imposed contrary to the mandate of P.L. 86-272.

## II.  STATEMENT OF FACTS

The taxpayer, Stanislaus Food Products Company, located in Stanislaus County, California, is a canner of tomato products. The taxpayer's tomato products

are shipped to food service independent distributors who in turn sell directly to restaurants.

The taxpayer employs a representative who lives in New Jersey. The representative does not have a set office in New Jersey and works from his home. The taxpayer provides a vehicle, phone, computer and samples to the representative. The representative visits restaurateurs and encourages them to compare their current sauce to taxpayer's. The representative provides the restauranteurs with names of independent distributors selling taxpayer's product. However, the representative has no responsibility for prices as these are set by the independent distributors.

The taxpayer makes calls to restauranteurs to verify that they have "converted" to the taxpayer's products. The taxpayer asserts that the calls are necessary since the restauranteur is purchasing the products from an independent distributor. Initially, the taxpayer maintained an inventory in South Plainfield, New Jersey, but that arrangement ended in June of 2011. For the tax years in question, 2012 through 2014, the taxpayer did not maintain an inventory of products in New Jersey.

While some of the aforementioned facts would be important in determining whether an entity is protected by P.L. 86-272 for years prior to 2012, the Director does not dispute that the taxpayer was an entity covered by P.L. 86-272 for 2012 through 2014.

## III.  PROCEDURAL HISTORY

At the onset, the taxpayer filed its returns and paid the Corporation Business Tax (CBT) based upon its net income.  The Director then audited taxpayer's returns and issued a deficiency assessment.   The taxpayer filed amended returns indicating it qualified as a P.L. 86-272 taxpayer, thus exempting it from a net income tax such as the CBT.  Agreeing that the taxpayer qualified as a P.L 86-272 entity for 2012 through 2014, the Director allowed a refund of the CBT.  However, the Director imposed the Alternative Minimum Assessment (AMA) gross profits tax and reduced the amount of the refund.

The taxpayer appealed to this court challenging the Director's ability to impose the AMA on a P.L. 86-272 entity.  The taxpayer moved for partial summary judgment as to this issue.  The Director cross-moved for partial summary judgment asserting that it is proper to impose the AMA.  Our Supreme Court has indicated that summary judgment provides a prompt, business-like and appropriate method of disposing of litigation in which material facts are not in dispute.  Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 530 (1995).  The Director did not dispute the central material fact in this case, that is, the taxpayer was an entity covered by P.L. 86-272 from 2012 to 2014.  Thus, the court was left with the legal issue of the applicability of the AMA to P.L. 86-272 taxpayers for the years in question.

After deciding the motions for partial summary judgment in favor of the taxpayer, the Director requested reconsideration. The traditional standard for reconsideration as to <u>final</u> orders requires that the trial judge overlooked some pertinent law or incorrectly assessed some material fact. <u>R.</u> 4:49-2. <u>See also</u> <u>D'Atria v. D'Atria</u>, 242 N.J. Super. 392, 401 (Ch. Div. 1990). This rigorous standard is important to ensure a certain degree of finality in litigation while at the same time providing a safety valve in the event of trial court error.

However, the prior decision in this case was not final, but interlocutory. There are still outstanding issues to be addressed after this reconsideration motion is addressed. "Interlocutory orders are always subject to revision in the interests of justice." <u>Lombardi v. Masso</u>, 207 N.J. 517, 536 (2011). As stated by the rule governing interlocutory orders, "[a]ny order or form of decision which adjudicates fewer than all the claims as to all the parties . . . shall be subject to revision at any time before the entry of final judgment in the sound discretion of the court in the interest of justice." <u>R.</u> 4:42-2. <u>Compare</u> <u>R.</u> 4:49-2.[1] As explained in commentary

_____

[1] To be clear, <u>R.</u> 4:42-2 applies to reconsideration of interlocutory orders; <u>R.</u> 4:49-2 applies to reconsideration of final orders. The pertinent part of the rules as to motions for reconsideration are as follows:

| Interlocutory (R. 4:42-2): | Final (R. 4:49-2): |
|---|---|
| In the absence of such direction, any order or form of decision which adjudicates fewer than all the claims as to | a motion for rehearing or reconsideration seeking to alter or amend a judgment or order shall be |

to our rules of court, "[a] significant aspect of the interlocutory nature of an order is its amenability to the trial court's control until entry of final judgment without interposition of considerations appropriate to finality." Pressler & Verniero, Current N.J. Court Rules, cmt. 3 on R. 4:42-2 (2020). This rule makes sense since "[t]hat special power afforded to judges over their interlocutory orders derives from the fact that cases continue to develop after orders have been entered and that judges likewise continue to think about them." Lombardi, 207 N.J. at 536.

"Although the rule is expansive, the power to reconsider an interlocutory order should be exercised 'only for good cause shown and in the service of the

---

all the parties . . . shall be subject to revision at any time before the entry of final judgment in the sound discretion of the court in the interest of justice. To the extent possible, application for reconsideration shall be made to the trial judge who entered the order.

[R. 4:42-2.]

served not later than 20 days after service of the judgment or order upon all parties by the party obtaining it. The motion shall state with specificity the basis on which it is made, including a statement of the matters or controlling decisions which counsel believes the court has overlooked or as to which it has erred, and shall have annexed thereto a copy of the judgment or order sought to be reconsidered and a copy of the court's corresponding written opinion, if any.

[R. 4:49-2.]

ultimate goal of substantial justice.'" Ibid., (quoting Johnson v. Cyklop Strapping Corp. 220 N.J. Super. 250, 263-64 (App. Div. 1987)). The Director here is not merely seeking another bite at the apple [2], but is trying to develop the record in a complex tax case involving two competing tax statutes, one federal and one state with an overlay of constitutional issues. The traditional standard for reconsideration which must be used for final orders (and for good cause may be used for interlocutory orders) is simply inapplicable here. Considering the importance and complexity of the issues raised in this action, the court has good cause to address the refined and expanded arguments of the parties with an eye towards the ultimate goal of substantial justice.

## IV.  LEGAL CONCLUSIONS

### A. New Jersey Adopts a Net Income Tax on Corporations

As indicated at the outset, the issue is whether the New Jersey Alternative Minimum Assessment (AMA) is preempted by P.L. 86-272, a federal law. To fully understand the issue, some background as to taxation of corporations in New Jersey is necessary. In 1945, New Jersey enacted the Corporation Business Tax (CBT). L. 1945, c. 162 (codified as N.J.S.A. 54:10A-1 to -28.) Initially, the tax was only based

---

[2]  The apple analogy has been used in D'Atria to indicate that reconsideration "motion practice must come to an end at some point, and if repetitive bites at the apple are allowed, the core will swiftly sour." D'Atria, 242 N.J. Super. at 401. As stated, both parties work on this motion reflects a refinement of the issues, not merely seeking another bite at the apple.

-8-

on a corporation's net worth allocated to New Jersey. L. 1945, c. 162, § 5. In 1958, the Act was amended to also tax net income allocable to New Jersey. L. 1958, c. 63. N.J.S.A. 54:10A-5(c). The starting point for this tax is a determination of "net income" which includes net income from all sources whether within or outside the state. L. 1958 c. 63, § 1(k). N.J.S.A. 54:10A-4(k).

While the United States Constitution prohibits a state from taxing all income of an out-of-state corporation without regard to where it has been earned, a state can fairly apportion and tax income allocable to it. Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 285 (1977). Generally speaking, "the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated." Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 169 (1983). New Jersey has such a formula which has been amended from time to time. See N.J.S.A. 54:10A-6.

**B. The Supreme Court's Expansion of Interstate Taxation and Congress' Response**

Shortly after the New Jersey Legislature approved a net income tax on corporate businesses in 1958, the United States Supreme Court had the opportunity in 1959 to consider the reach of state-imposed apportioned net income taxes in Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450 (1959). As explained by the Court, "[t]hese cases concern the constitutionality of state net income tax laws levying taxes on that portion of a foreign corporation's net income

earned from and fairly apportioned to business activities within the taxing State when those activities are exclusively in furtherance of interstate commerce." Id. at 452. There was not any question as to the fairness of any apportionment. Id. at 453-54. Rather, the issue was whether these state net income tax statutes violated the Commerce Clause of the United States Constitution.[3] Id. at 452.

The Commerce Clause provides "[t]he Congress shall have the Power . . . to regulate Commerce . . . among the several States . . . ." U.S. Const. art. I, § 8, cl. 3. The United States Supreme Court has recognized that:

> [t]hese "few simple words . . . reflected a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation."
>
> [Comptroller of the Treasury of Maryland v. Wynne, 135 S. Ct. 1787, 1794 (2015) (quoting Hughes v. Oklahoma, 441 U.S. 322, 325-26 (1979)).]

In other words, the impetus for adopting our constitutional system was commerce and trade.

Shortly after the signing of the Declaration of Independence in 1776, the Articles of Confederation were adopted in 1777 and came into force in 1781 after ratification by the states. 1 The Documentary History of the Ratification of the

---

[3] The Court also considered whether the taxes violated the Due Process Clause.

Constitution 73, 86, 135 (Merrill Jensen ed. 1976). Under the Articles of Confederation, the federal government was powerless to control interstate commerce leaving the states free to discriminate against out-of-state sellers. This led to disputes over trade and commerce between the states. A convention was called to be held in Annapolis, Maryland in 1786 with the goal of resolving the disputes. Id. at 181. Not all the states appointed commissioners to the convention, and even fewer states attended. Id. at 181-85. Notably, the New Jersey commissioners attended with an expanded mandate to consider not only a "uniform system in [the states'] commercial regulations," but also "other important matters." Id. at 183. While the Annapolis convention was not a success in resolving the commerce disputes between the states, the report of the convention suggested that all states follow New Jersey's lead and extend the power of their commissioners "to other objects than those of Commerce." Id. at 183-84. That lead to the Constitutional Convention of 1787 which resulted in our current federal constitution containing what is commonly referred to as the Commerce Clause.

The Commerce Clause has been construed to contain both a power and prohibition. The power is reflected in the express or affirmative words of the Constitution which empowers Congress to regulate commerce among several states. On the other hand, the prohibition is contained in what is known as the negative or dormant Commerce Clause, "prohibiting certain state taxation even when Congress

has failed to legislate on the subject." [4] <u>Comptroller of Treasury</u>, 135 S. Ct. at 1794 (quoting <u>Oklahoma Tax Comm'n v. Jefferson Lines, Inc.</u>, 514 U.S. 175, 179 (1995)). More broadly, "the dormant Commerce Clause precludes States from 'discriminating between transactions on the basis of some interstate element.'" <u>Ibid.</u> (quoting <u>Boston Stock Exchange v. State Tax Comm'n</u>, 429 U.S. 318, 332 n. 12 (1977)).

Thus, embedded in the conceptual framework of the Commerce Clause are two facets, one dormant, and one affirmative, both addressing the concerns of potential overreach by the states that existed under the Articles of Confederation. The dormant Commerce Clause protects against state discrimination in interstate commerce. The affirmative Commerce Clause empowers Congress to take action to regulate interstate commerce. A review of the case-law reflects that most Commerce Clause disputes that find their way to the courts concern discrimination pursuant to the dormant Commerce Clause, as compared to the affirmative congressional power conferred by the Commerce Clause to regulate interstate commerce. <u>Compare</u> <u>South Dakota v. Wayfair Inc.</u>, 138 S. Ct. 2080, 2089-90 (2018) (dormant Commerce Clause); <u>Comptroller of Treasury</u>, 135 S. Ct. at 1794 (2015) (dormant Commerce

---

[4] Even though impliedly referred to as distinct, there is not a dormant Commerce Clause separate and apart from the affirmative Commerce Clause in the Constitution. Rather the dormant Commerce Clause reflects a judicial concept found in interpreting the actual words of the Commerce Clause. The concept dates back to 1824. <u>See</u> <u>Gibbons v. Ogden</u>, 22 U.S. 1, 209 (1824).

Clause); McBurney v. Young, 569 U.S. 221, 234 (2013) (dormant Commerce Clause); Dep't of Rev. v. Davis, 553 U.S. 328, 337 (2008) (dormant Commerce Clause); Am. Trucking Ass'ns v. Mich. PSC, 545 U.S. 429, 433 (2005) (dormant Commerce Clause) with Morales v. TWA, 504 U.S. 374, 390 (1992) (affirmative Commerce Clause); Exxon Corp. v. Hunt, 475 U.S. 355, 362 (1986) (affirmative Commerce Clause); Aloha Airlines v. Dir. of Tax'n, 464 U.S. 7, 9-10 (1983) (affirmative Commerce Clause). It is not surprising there are more dormant clause cases. An affirmative Commerce Clause case does not arise unless Congress acts. On the other hand, an action of any one of fifty state legislatures can trigger a dormant Commerce Clause challenge.

Prior to the Supreme Court deciding Northwestern in 1959, there was some question as to whether an out-of-state seller could be taxed by the state in which the purchaser was located. Northwestern, 358 U.S. at 457-58. With "some three hundred full-dress opinions" by the Supreme Court up through 1959 on the topic, there was "need for clearing up the tangled underbrush of past cases." Ibid. Thus, in deciding Northwestern on February 24, 1959, the Supreme Court held that "net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same." Id. at 452. In other words, out-of-state entities could be taxed for income derived

-13-

within a state. While not mentioning the dormant Commerce Clause by name, it is readily apparent that the Supreme Court was indeed proceeding under the dormant Commerce Clause.

Northwestern resulted in an uproar in the business community. See generally State Taxation on Interstate Commerce-1959: Hearing before the S. Select Comm. on Small Bus., 86th Cong., Part 1 (April 8, 1959), Part 2 (May 1, 1959), Part 3 (June 19, 1959) (Hearing). The business community indicated that the limits set by the Supreme Court were unclear and lead to uncertainty. H.R. Rept. No. 86-936, 2 (1959). Concerns were also raised as to the perceived tremendous difficulty of complying with a multitude of existing state and local tax laws. Ibid. Congress sprung into action with public hearings starting on April 8, 1959. These hearings were not only scheduled for Washington D.C., but also Boston, Massachusetts, Newark, New Jersey and New York, New York. See Hearing.[5]

Less than seven months later, on September 14, 1959, P.L. 86-272, which limited the scope of interstate commerce that would be subject to a net income tax, became law. In particular, P.L. 86-272 provides for "minimum standards" which disallow a state net income tax on interstate commerce if the only in-state activity is

---

[5] The hearings in Newark, New Jersey and New York, New York were cancelled due to an "important [Senate] vote". Hearing Part 3-Forward. However, witnesses submitted written statements. Hearing Part 3.

the solicitation of orders of tangible personal property which are approved or rejected out-of-state. 15 U.S.C. § 381(a).[6] Moreover, the statute defines net income tax as "any tax imposed on, or measured by, net income." 15 U.S.C. § 383. It is without question that New Jersey's CBT is a tax measured by net income. Armada

---

[6] The full text follows:

> Minimum standards. No State, or political subdivision thereof, shall have power to impose, for any taxable year ending after the date of the enactment of this Act [enacted Sept. 14, 1959], a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:
>
> > (1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and
> >
> > (2) the solicitation of orders by such person, or his representative, in such State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1).
>
> [15 U.S.C. § 381(a).]

Hess v. Dir., Div. of Tax'n, 107 N.J. 304, 334 (1987). See also N.J.S.A. 54:10A-5(c).

"Congress has broad authority under the [Commerce] Clause." Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 549 (2012). "'[T]he power of Congress over interstate commerce is not confined to the regulation of commerce among the states,' but extends to activities that 'have a substantial effect on interstate commerce.'" Ibid. (citing United States v. Darby, 312 U.S. 100, 118-19 (1941)). The affirmative words of the Commerce Clause give Congress plenary power to regulate commerce through enactments such as P.L. 86-272 so long as a rational basis exists for Congress to conclude that the activities being impacted substantially affect interstate commerce. Gonzales v. Raich, 545 U.S. 1, 22, 29 (2005) (rational basis and plenary power); United States v. Lopez, 514 U.S. 549, 553 (1995) (commerce power to be exercised to utmost extent).

The United States Supreme Court has explained that the rational basis expressed by Congress for the "minimum standards" of P.L. 86-272 was to provide clarity to the perceived uncertainty arising from the Supreme Court's decision in Northwestern. Heublein, Inc. v. South Carolina Tax Comm'n, 409 U.S. 275, 279-280 (1972). "By establishing such a limit, [i.e. minimum standards,] Congress did, of course, implicitly determine that the State's interest in taxing business activities below that limit was weaker than the national interest in promoting an open

economy." Id. at 280. The rationale recognizes the concerns of the business community as to the uncertainty in dealing with multiple taxing regimes.[7]

---

[7] One notable objection to the legislation was raised by Representative Wright Patman, then chair of the House Small Business Committee. In what appears from the record to be a heated floor debate, Patman complained "[P.L. 86-272] would enable the interstate companies to avoid paying their share of such taxes". 105 Cong. Rec. 17772 (1959); See also Id. at 17769-17776. Patman also complained the legislation was rushed without any committee hearings in the House of Representatives. Id. at 17772. He had further concern that "[P.L. 86-272] will be a great harm and a disadvantage to hometown merchants." Id. at 17771. With P.L. 86-272, Patman argued that "the hometown merchants that they must continue to assume all this burden, and the people on the outside of the State doing business in that community in competition with the local merchants will not have to pay any part of the taxes, although that person has taken part of the local merchant's business and the Supreme Court said he should pay a part of the profits to the local community just like the hometown merchant pays." Ibid. Echoes of this debate would be heard many years later when New Jersey set about adopting the Alternative Minimum Assessment.

Wright Patman served in Congress for nearly fifty years. He was Chair of the Small Business Committee for twelve years and was later named chair of the powerful House Banking Committee. His most notable accomplishment was the Robinson-Patman Act which resulted in the Federal Trade Commission bringing an antitrust action against A&P, then the largest grocery store chain in the United States with 14,800 stores nationwide. Great Atl. & Pac. Tea Co. v. Fed. Trade Comm'n, 106 F.2d 667 (3d Cir. 1939). See generally Nancy Beck Young, Wright Patman (2000). The Robinson-Patman Act was also the basis for the Federal Trade Commission to decide in 1943 that seventy-five members of the Cement Institute including Northwestern States Portland Cement Company, the plaintiff in the Northwestern decision, were engaged in price fixing. 37 F.T.C. 87, 99, 134, 259 (1943) (rev'd by Aetna Portland Cement Co. v. Fed. Trade Comm'n, 157 F.2d 533 (7th Cir. 1946), rev'd by Fed. Trade Comm'n v. Cement Inst., 333 U.S. 683 (1948)). Whether this influenced Representative Patman's debate comments is unknown.

Concerns similar to those of Representative Patman were raised in the Senate as well. S. Rep. No. 86-658, at 12, 14 (1959) (minority and individual views).

P.L. 86-272 was considered a temporary solution to address the perceived pressing concerns of Northwestern. Id. at 281. Comprehensive legislation was to follow careful study by a congressional committee. Ibid. Needless to say, the law was never amended.

Finally, it is important to remember that the "minimum standards" set forth in P.L. 86-272 only apply to a net income tax, as opposed to a gross receipts or gross profits tax. Moreover, the "minimum standards" only apply to sales of tangible personal property, as opposed to intangible personal property or services.[8]

## C. The Regulation of Commerce by Congress

Both parties in this case have spent some time arguing over whether the AMA is discriminatory against interstate commerce. That is not surprising considering the vast majority of decisions deal with the dormant Commerce Clause. However, the court is not dealing with a situation in which Congress has not spoken, thereby raising the nondiscriminatory mandate of the dormant Commerce Clause. "Judicial review of state taxes under the [dormant] Interstate Commerce Clause is intended to ensure that States do not disrupt or burden interstate commerce when Congress'

___

[8] The original Senate bill applied to tangible personal property. S. 2524, 86th Cong. (1959). The House bill applied to all transactions. H.R.J. Res. 450, 86th Cong. (1959). After initial passage, the conference decided to keep the tangible personal property limitation. The House acceded to this change. H.R. Rep. No. 86-1103, at 4 (1959) (reprinted in 105 Cong. Rec. 17770 (1959)). The rationale for or against this decision is unknown.

power remains unexercised . . . ." <u>Merrion v. Jicarilla Apache Tribe</u>, 455 U.S. 130, 154 (1982). Rather, Congress has exercised its powers under the Commerce Clause and enacted <u>P.L.</u> 86-272 to set certain minimum standards below which a state cannot impose net income taxation. Once Congress acts, courts are not free to review state taxes under the dormant Commerce Clause since it is Congress, and not the courts, that has struck the balance that it deems appropriate.[9] <u>Ibid.</u>

Broadly speaking, the power of Congress to supersede state tax laws as a rational part of an interstate regulatory regime has been affirmed on a number of occasions. See e.g. <u>CSX Transp. Inc. v. Ga. State Bd. of Equalization</u>, 552 U.S. 9, 20-22 (2007) (federal statute regulates states' imposition of taxes on railroads); <u>Exxon Corp. v. Hunt</u>, 475 U.S. 355, 376 (1986) (federal environmental statute preempts New Jersey's ability to impose certain taxes); <u>Aloha Airlines v. Dir. of Tax'n</u>, 464 U.S. 7, 14-15 (1983) (Congress may prohibit state gross receipts tax on airlines); <u>Ariz. Pub. Serv. Co. v. Snead</u>, 441 U.S. 141, 150 (1979) (within power of Congress to select reasonable method to eliminate the interference of state tax); <u>Delaware Cnty. v. Fed. Hous. Fin. Agency</u>, 747 F.3d 215, 223-28 (3d Cir. 2014) (New Jersey and Pennsylvania cannot impose transfer tax on properties sold by federal agency).

---

[9] "[I]t matters not that the courts would invalidate the state tax or regulation under the [dormant] Commerce Clause in the absence of congressional action." <u>Ibid.</u>

Congress is not constrained by the Commerce Clause to only limiting the power of the states. Congress can also empower the states to enact provisions that allow states to treat in-state and out-of-state businesses differently. In the McCarren-Ferguson Act, Congress delegated to the states the ability to regulate the insurance industry. 15 U.S.C. §§ 1011, 1012. As such, the Supreme Court has held that a tax imposed by a state only on out-of-state insurers is allowed per the Commerce Clause. Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 434-36 (1946). However, such a tax may face a challenge from insurers on equal protection grounds. Metro. Life Ins. Co. v. Ward, 470 U.S. 869, 880. (1985). Nevertheless, if Congress so chooses, its power to regulate interstate commerce is broad.[10]

---

[10] Despite the broad reach of the Commerce Clause, an action of Congress could still be in tension with due process or equal protection as guaranteed by the Fifth Amendment, or rights reserved to the states under the Tenth Amendment. See Sec'y. of Agric. v. Cent. Roig Refining Co., 338 U.S. 604, 616 (1950) (Fifth Amendment Due Clause Process trumps Commerce Clause). See also, United States v. Stoeco Homes, Inc., 498 F.2d 597, 611 (3d Cir. 1974). The Fifth Amendment which applies to the federal government does not have explicit equal protection language like the Fourteenth Amendment which applies to the states. Bolling v. Sharpe, 347 U.S. 497, 498-99 (1954). Equal protection is implied by the Fifth Amendment. Ibid., United States v. Armstrong, 517 U.S. 456, 464-65 (1996). Parenthetically, as to any Equal Protection argument, for economic statutes such as those regarding taxation, only a rational basis has to be shown to sustain a statute on Equal Protection grounds. See Chamber of Commerce v. State, 89 N.J. 131, 158 (1982).

A due process challenge could arise as to a Commerce Clause enactment if Congress extended the jurisdictional reach or nexus of a state to reach taxpayers that should not otherwise be taxed. Here, P.L. 86-272 does the opposite in that it reduces the reach of the states to impose taxation. Moreover, the Fifth Amendment Due Process Clause protects persons, and "cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union, and to our

-20-

When Congress has spoken, and there is tension with a state enactment, the Supremacy Clause provides the vehicle for resolving this tension. The Supremacy Clause of the Constitution provides "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." [11] U.S. Const., art. VI, cl. 2. The Supremacy Clause is not a source of rights. Instead, it simply

---

knowledge this has never been done by any court." South Carolina v. Katzenbach, 383 U.S. 301, 323-24 (1966). Pennsylvania v. Riley, 84 F.3d 125, 130 n.2 (3d Cir. 1996).

The broad reach of the Commerce Clause can also be in tension with the Tenth Amendment which reserves to the states powers not delegated to the federal government. Compare Lopez, 514 U.S. at 566-67 (Congress does not have plenary police power to ban guns in school zone) with United States v. Tucker, 90 F.3d 1135, 1139-41 (6th Cir. 1996) (upholding drug ban in school zone since impacts commerce). The exact contours of any tension with Due Process, Equal Protection or the Tenth Amendment need not be decided since neither party challenges the constitutionality of P.L. 86-272.

Prior challenges to P.L. 86-272 on constitutional grounds have been rejected. Int. Shoe Co. v. Cocreham, 164 So. 2d 314 (La. 1964), cert. denied, Mouton v. Int. Shoe Co., 379 U.S. 902 (challenge to P.L. 86-272 raised by state collector along with amici curiae of attorneys general of 19 states.) Smith Kline & French Laboratories v. State Tax Comm'n, 403 P.2d 375 (Or. 1965) (challenge to P.L. 86-272 raised by tax commission along with amici curiae of attorneys general of 12 states); State ex rel. Ciba Pharmaceutical Prod. v. State Tax Comm'n, 382 S.W.2d 645 (Mont. 1964) (challenge to P.L. 86-272 raised by state tax commission along with amici curiae of 3 other states); Nat'l Private Truck Council v. Comm'r, 688 N.E.2d 936 (Mass. 1997).

[11] In addition, "all . . . judicial Officers . . . of the several States, shall be bound by Oath or Affirmation, to support this Constitution." U.S. Const. art. VI, cl. 3.

provides a rule of decision for courts to follow when federal and state law are in conflict. Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 324-25 (2015). As such, the issue is whether federal law preempts a state law enactment. English v. General Electric Co., 496 U.S. 72, 78 (1990).

The first step is whether the federal law is a valid exercise of power, or is instead a power reserved to the states. It is not disputed that Congress properly implemented P.L. 86-272 pursuant to the Commerce Clause. Moreover, Congress had a rational basis for the law. Heublein, 409 U.S. at 279-280. Thus, there is not any challenge in this case that Congress could not act.

The second step is "[w]hether a state law stands as an obstacle to the accomplishment of a federal objective, [and] requires a court to consider 'the relationship between state and federal laws as they are interpreted and applied, not merely as they are written.'" R.F. v. Abbott Labs., 162 N.J. 596, 618 (2000) (quoting Jones v. Rath Packing Co., 430 U.S. 519, 526 (1977)). "Determining whether federal law preempts state law is a fact-sensitive endeavor, based on a court's review of fragments of statutory language, random statements in the legislative history, and the degree of detail of the federal regulation. However, preemption 'is not to be lightly presumed.'" Id. at 619 (quoting Turner v. First Union Nat'l Bank, 162 N.J. 75, 87 (1999)) (citation omitted).

Preemption can occur in three circumstances referred to as express, conflict or field preemption. With express preemption, Congress explicitly indicates through statutory language what type of state law the enactment is attempting to preempt. English, 496 U.S. at 78-79. Conflict preemption applies when it is impossible for a party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Id. at 79. Finally, field preemption occurs when federal law occupies and regulates a field so comprehensively that it has left no room for supplementary state legislation. Ibid. See also, R.J. Reynolds Tobacco Co. v. Durham County, 479 U.S. 130, 140 (1986). The preemption categories are not rigidly distinct. R.F., 162 N.J. at 618.

When a state law is subject to preemption, it is displaced by federal law. Turner, 162 N.J. at 88. The state law still exists but becomes unenforceable and suspended. Constantino v. Borough of Berlin, 348 N.J. Super. 327, 332 (App. Div. 2002). It is nullified to the extent of the conflict with federal law. Turner, 162 N.J. at 88. If the federal law is repealed or sunsets, the preempted state law is reinstated or revived without further action of the Legislature. Constantino, 348 N.J. Super. at 332. The New Jersey courts have displaced a number of state provisions that have been found to be preempted by federal law. See, e.g., Turner 162 N.J. at 93-94 (state limit on mortgage closing fees preempted by federal banking regulations); Chamber

of Commerce v. State, 89 N.J. 131 (1982) (National Labor Relations Act preempts New Jersey Strikebreakers Act).

The court needs to first examine whether the provisions of P.L. 86-272 constitute an explicit, and thus express, preemption of the AMA. Alternatively, the court needs to examine whether there is a conflict preemption in that the AMA stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Finally, field preemption is plainly inapplicable because Congress has not comprehensively regulated the field of taxation of interstate business. The court, having already addressed the history of P.L. 86-272, now turns to the history of the AMA.

### D. The Enactment of the AMA

Exactly five months after the attacks on New York and Washington on September 11, 2001, then Governor McGreevey addressed a joint session of the Legislature. In his address, he indicated "[o]ur economy, battered by the heinous attack of September 11, is still in the grips of a national recession. Tax revenues are declining." Governor James E. McGreevey, Budget Address to the Joint Session of the Legislature (Feb. 11, 2002). He indicated a three billion dollar shortfall for the then current fiscal year and a six billion dollar shortfall for the succeeding fiscal year. Ibid. Six weeks later, the Governor again addressed the Legislature. This time he focused on the Corporation Business Tax as a means to address the shortfall.

-24-

Governor James E. McGreevey, Budget Address to the Joint Session of the Legislature (Mar. 26, 2002). He noted that the CBT once accounted for fifteen percent of all state revenues. Ibid. However, by 2002, the CBT accounted for about five percent of state revenues. See also Budget, Fiscal Year 2002-2003 C-4; Off. of Legis. Services Tax and Revenue Outlook 12 (Apr. 2002) (CBT in 1982 accounted for 15% of state revenues, in 2002 declined to 6.6%, with projected decline to about 4% in fiscal year 2003). The Governor promised "to restore the integrity of the corporate income tax by eliminating the loopholes and gimmicks that have allowed companies to shirk their responsibilities." McGreevey Budget Address (March 26, 2002).

The budget submitted by the Governor recognized that the "CBT also fails to reach many companies that have no physical presence in New Jersey, but send their sales forces into New Jersey's lucrative market. Those companies are able to entirely avoid New Jersey corporate taxes." Budget, Fiscal Year 2002-2003 C-5. Part of the plan to address the issue was an alternative minimum assessment "based not just on corporate profits . . . ." Ibid.

It was not until May 20, 2002 that a bill emerged which contained the AMA. S. 1556 (2002). However, the AMA was not proposed as a permanent measure. The AMA was planned to sunset in 2006 except for P.L. 86-272 entities. Id. at § 7. The

AMA was part of the larger and far-reaching Business Tax Reform Act (BRTA).

The sponsors of the bill were concerned that:

> these companies are able to take advantage of the state's lucrative market, extensive infrastructure, and geographic prominence, while paying no corporate taxes to New Jersey. If some companies exploit loopholes and avoid paying their fair share then the corporate citizens who pay their fair share are put at a competitive economic disadvantage with companies that evade or exploit the system.
>
> [Sponsor's Statement to S. 1556 52 (2002) (Senate Sponsor's Statement); Sponsor's Statement to A.2501 51 (2002) (Assembly Sponsor's Statement) (emphasis added).]

The purpose of the Business Tax Reform Act was to provide sweeping changes "intended to reform New Jersey's system of taxation of corporations and other business entities, through revision of the corporation business tax and other changes of law." A. Budget Comm. Statement to A. 2501 1 (June 27, 2002). S. Budget and Appropriations Comm. Statement to S. 1556 1 (June 27, 2002) (collectively referred to as Committee Statements). The bill sought to "increase equity among business taxpayers and close[] numerous loopholes that allow many profitable companies to reduce their taxable New Jersey income." Ibid. As explained by the Committee:

> [t]he AMA also assures a fair measure of support for state services from firms that exploit the State's marketplace, but are exempt from a tax like the CBT pursuant to [P.L. 86-272]. This reform will effectively capture the value of

-26-

the activities in New Jersey of out-of-state companies that currently pay no corporate income taxes in New Jersey.

[Committee Statements at 5 (emphasis added).]

The corporation business tax was generally 9.0% of the net income allocated to the State.[12, 13] N.J.S.A. 54:10A-5. The AMA consisted of a tax not on net income, but on either gross profits in excess of $1,000,000, or gross receipts in excess of $2,000,000.[14] L. 2002, c. 40, § 7(b). The rate increases progressively from 0.25% up to 0.8% for gross profits and from 0.125% up to 0.4% for gross receipts. Ibid.

The law provided for two similar, yet significantly distinct, implementation phases for the AMA. The first phase was in effect from 2002 through part of 2006. L. 2002, c. 40, § 7(b), (c). N.J.S.A. 54:10A-5a(b), (c) (repealed 2018). It provided that all taxpayers, both in-state and out-of-state, would be required to pay the greater

---

[12] Parenthetically, up until 2008, if a corporation only had in-state business locations, 100% of its income would be allocated to New Jersey. L. 2008, c. 120, § 2. N.J.S.A. 54:10A-6.

[13] A corporation can elect to be a Subchapter S corporation in which the income passes through the corporation and is instead taxed as gross income tax to the shareholders. Subchapter S corporations must be certain closely held corporations of 100 or fewer shareholders. 26 U.S.C. § 1361. Subchapter S Corporations are not subject to the AMA. L. 2002, c. 40, § 5. N.J.A.C. 18:7-18.3(a)(1). This decision focuses upon Subchapter C corporations, the type of taxpayer in this decision.

[14] The taxpayer was to elect for the first tax period whether to apply the gross profit or gross receipt computation. The election would be effective for the next four tax periods. L. 2002, c. 40, § 7(c). N.J.S.A. 54:10A-5a(c) (repealed 2018).

of either the CBT or the AMA. Ibid.[15]  Since a P.L. 86-272 taxpayer is not subject to a net income tax such as the CBT, the P.L. 86-272 taxpayer would still be subject to the AMA.  In other words, all corporate taxpayers would be subject to the greater of the AMA or CBT.  The court need not pass upon whether this initial implementation of the AMA can be sustained since the tax years at issue occur during the second phase of the AMA implementation described below.

The second phase provided that for "taxpayers exempt from corporation net income tax pursuant to [P.L. 86-272,] assessment [of the AMA] shall continue to be computed . . . ."  L. 2002, c. 40, § 7(e).  N.J.S.A. 54:10A-5a(e) (repealed 2018).  However, a P.L. 86-272 corporation "that has filed a consent . . . to the jurisdiction of this State to impose and the duty of the taxpayer to pay the [CBT] . . . shall have an alternative minimum assessment . . . of $0.00."  Ibid.  Stated plainly, the only entities paying AMA would be P.L. 86-272 taxpayers.  However, if a taxpayer protected by P.L. 86-272 consents to CBT taxation, it will not be subject to the AMA.  In other words, a P.L. 86-272 taxpayer would be subject to the lesser of the AMA or CBT.[16]

---

[15] P.L. 86-272 minimum standards rose the permissible qualitative floor upon which there could be net income taxation.  However, it did not raise the floor as to other forms of taxation such as a gross profits or gross receipts tax.

[16]  The AMA was repealed on July 1, 2018 and the repeal applies to tax years beginning on or after January 1, 2018.  L. 2018, c. 48, §§ 32, 33.

### E. The AMA is Subject to Preemption

In light of the foregoing, the court must examine whether the AMA is preempted through the Supremacy Clause in that it runs afoul of Congress' Commerce Clause powers to regulate interstate commerce through P.L 86-272. In other words, the issue boils down to whether the AMA stands as an obstacle to the accomplishment and execution of the purposes and objectives of P.L. 86-272.

P.L. 86-272 in plain terms indicates that "[n]o State . . . shall have power to impose . . . a net income tax" on certain "sales of tangible personal property. . . ." 15 U.S.C. § 381(a). For the tax years 2012 through 2014, the Director recognized that since the taxpayer did not house or store inventory in New Jersey, P.L. 86-272 status was applicable. With the finding of P.L. 86-272 status, the Director determined that CBT was not assessable and issued a refund. Nevertheless, the Director insisted upon the taxpayer paying the AMA and reduced the CBT refund.

The second phase of the AMA implementation at issue here represents an effort to avoid the express prohibition of a net income tax on P.L. 86-272 taxpayers. The court looks to the statutory language, the legislative history, and the details of the federal law. R.F., 162 N.J. at 619. The plain language of the second phase plainly reveals that the law only applies to P.L. 86-272 entities. The second phase plainly provided that for "taxpayers exempt from corporation net income tax pursuant to [P.L. 86-272,] assessment [of the AMA] shall continue to be computed

-29-

. . . ." L. 2002, c. 40, § 7(e). N.J.S.A. 54:10A-5a(e)(repealed 2018). To be clear, the AMA is imposed upon no other group of taxpayers except those which enjoy a P.L. 86-272 exemption.

The extensive legislative statement by the Assembly Budget Committee, as well as the Senate Budget and Appropriations Committee, is illuminating as to the sentiment towards P.L. 86-272 entities. The Committees wanted to "effectively capture" P.L. 86-272 entities that "exploit the State's marketplace, but are exempt from a tax like the CBT." Committee Statements at 5 (emphasis added). The Committees' use of the phrase "effectively capture" is especially telling of the effort to get around P.L. 86-272. It is further explained that "[t]o avoid any claim of discriminatory treatment," P.L. 86-272 taxpayers can consent to the lower CBT. Id. at 6. Any claim the AMA does not specifically target P.L. 86-272 taxpayers simply ignores both the plain reading of the statute as well as the legislative history.

While the bill sponsors' complaints that outside corporations "evade or exploit the system" may certainly be laudable, there is not any serious dispute that these corporations were merely acting under the parameters for taxation established by Congress. See Senate Sponsor's Statement at 52 and Assembly Sponsor's Statement at 51. Perhaps, more accurately, the concern of the Legislature is that Congress created a scheme that allowed out-of-state corporations to "evade or exploit the system." The corporations were merely exercising the legal standing

-30-

conferred by Congress. To now take the benefit of that standing away, strikes specifically at the heart of P.L. 86-272 and generally at the power of Congress to regulate interstate commerce.

Courts are guided in their preemption analysis by the rule that the purpose of Congress is the ultimate touchstone in every preemption case. Treasurer of N.J. v. U.S. Dept. of Treas., 684 F.3d 382, 406-07 (3d Cir. 2012). Congress expressed and determined that no net income tax would apply to P.L. 86-272 taxpayers. While New Jersey is free to disagree with federal policy, under preemption principles it may not create an insurmountable obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Hous. Auth. & Urb. Redevelopment Agency v. Spratley, 327 N.J. Super. 246, 255 (App. Div. 1999).

As stated, the law provides that the P.L. 86-272 taxpayer can pay the lesser of the CBT or the AMA. For a taxpayer in which the AMA is greater than the CBT, the AMA clearly operates as an end-run around P.L. 86-272, in that it coerces a taxpayer to consent and pay the CBT which is measured by net income. Thus, when the AMA is greater than the CBT, the AMA becomes a tax measured by net income since the taxpayer would be paying the CBT. "[A] tax on sleeping measured by the number of pairs of shoes you have in your closet is a tax on shoes." Hunt-Wesson, Inc. v. Franchise Tax Bd., 528 U.S. 458, 464 (2000) (quoting Trinova Corp. v. Mich. Dept. of Treasury, 498 U.S. 358, 374 (1991)). Likewise, an alleged tax on gross

income which is ultimately and actually measured by net income is within the scope of tax defined by P.L. 86-272. With the AMA greater than the CBT, this either constitutes grounds for express preemption since the AMA targets P.L. 86-272 entities, or conflict preemption since the AMA stands as an obstacle to Congress exempting P.L. 86-272 entities from net income taxation, albeit indirectly.

If the AMA is lower, the P.L. 86-272 taxpayer does not have to pay the CBT that is being assessed against a similarly situated taxpayer not protected by P.L. 86-272 exemption. Instead, the P.L. 86-272 entity would pay the AMA. It is upon this ground that it seems that the Director claims that the statute should not be subject to express preemption. Even if correct, there is still the issue of conflict preemption, which precludes the law of a state legislature when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." English, 496 U.S. at 79 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)). In enacting P.L. 86-272, Congress indicated that there shall be no net income tax, not merely a reduction which is collected in the form of the AMA as a stand-in for New Jersey's net income tax, the CBT. Obviously, if Congress were to allow P.L. 86-272 businesses to be taxed on net income at a lower amount, that would have been explicitly specified in the enactment.

Regardless of whether the amount assessed is above or below the CBT, the AMA is inextricably linked to the CBT. For a P.L. 86-272 entity, a consideration of

the CBT is always necessary to determine the amount of tax to be paid, regardless of whether the tax ultimately paid is the AMA or CBT.[17] Stated slightly differently, "the AMA is a part of the CBT and 'the Legislature imposed it to be used in calculating liability for corporation business taxes.'" State ex rel. Campagna v. Post Integrations, Inc., 451 N.J. Super. 276, 281 (App. Div. 2017) (quoting Equip. Leasing & Fin. Ass'n v. Dir., Div. of Tax'n, 24 N.J. Tax 527, 529 (Tax 2009)). "The purpose [of the AMA is] the generation of additional revenue from corporations that, in the Legislature's view, [are] not paying their fair share of the tax burden." Equip. Leasing & Fin., 24 N.J. Tax at 536. See also Committee Statements at 5.

By only subjecting P.L. 86-272 entities to the AMA, while other entities are not, the Legislature relegates the AMA to nothing more than a de-facto CBT, albeit at a potentially lower rate in cases where the AMA is lower. While the Director vigorously argues that the AMA is not a net income tax, but is technically a gross receipts or gross profits tax, the tax exclusively applies only to P.L. 86-272 taxpayers, and even more exclusively applies only to those P.L. 86-272 taxpayers that did not consent to net income taxation in the form of the CBT. The Legislature cannot create a special tax, whether it be a gross receipts, gross profits or some other

---

[17] Linking the AMA to the CBT is not necessarily an issue in all instances. The court here is only addressing the second phase of the AMA in which only P.L. 86-272 entities were subject to the AMA. The court is not considering the propriety of any linkage with the CBT when a tax such as the AMA does not specifically target P.L. 86-272 entities.

tax, that only applies to entities protected by P.L. 86-272 in a transparent attempt to garner lost net income tax. "[T]axation is a practical matter . . . ." In re Estate of Lichtenstein, 52 N.J. 553, 569 (1968). From a practical perspective, the AMA stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

To summarize, whether a state levy that exclusively targets P.L. 86-272 entities is denominated as a tax, user fee, penalty or otherwise, and whether it is the same, more, or less than the net income tax imposed pursuant to the CBT is irrelevant. "[C]onstitutional analysis of state taxation of interstate commerce depends not on the label given the tax but on the economic effects of the tax." Avco Fin. Servs. Consumer Disc. Co. One v. Dir., Div. of Tax'n, 100 N.J. 27, 31 (1985). "The label appended to the tax is not conclusive." Armada Hess, 107 N.J. at 334. "The manner in which the state legislature has described and categorized [a tax] cannot mask the fact that the purpose and effect of the provision are to impose a levy" contrary to the dictates of Congress. Aloha Airlines, 464 U.S. 7, 13-14 (1983). See also Avis Budget Grp. Inc. v. City of Newark, 427 N.J. Super. 326, 339 (App. Div. 2012) (quoting Aloha Airlines).

The fact remains that the AMA in this case solely and exclusively targets and "effectively capture[s]" P.L. 86-272 entities which Congress has determined are exempt from net income taxation. Committee Statements at 5. Moreover, in

adopting regulations applicable to the AMA, the Director commented that the second phase of the AMA at issue here applied to "taxpayers that otherwise would have claimed protection of [P.L. 86-272]." 35 N.J.R. 1573(a) (Apr. 7, 2003).

There is a presumption against preemption that must be overcome. See, Treasurer of N.J., 684 F.3d at 407. Moreover, since taxation is a traditional state power, the scope of federal supremacy cannot be beyond what Congress clearly mandated. Delaware Cnty., 747 F.3d at 225-26 (citing Dep't of Rev. of Or. v. ACF Indus., Inc., 510 U.S. 332, 345 (1994)). The presumption against preemption is overcome since the clear purpose of Congress in enacting P.L. 86-272 is effectively thwarted by the Legislature in enacting the AMA. As such, the AMA is subject to preemption.

This might be a different case if the AMA was truly a minimum assessment that applied to all entities regardless of P.L. 86-272 status. In such case, the Director could argue that he is not trying to collect a tax only from taxpayers which are otherwise exempt from net income tax, but is collecting a minimum amount from all taxpayers. For example, a flat minimum tax, separate and apart from the AMA, was in effect prior to 2006 and applied to all corporations regardless of income.[18]

---

[18] For 2006 forward, the minimum tax was no longer flat per se, but stepped. For a corporation that is not an S Corporation the tax was either $500, $750, $1,000, $1,500 or $2,000 depending on the amount of gross receipts. N.J.S.A. 54:10A-5(e). The validity of this tax is not at issue here.

N.J.S.A. 54:10A-5(e). This court has previously determined that such a tax did not run afoul of P.L. 86-272 since it was not based upon income. Home Impressions, Inc. v. Dir., Div. of Tax'n, 21 N.J. Tax 448, 461-62 (Tax 2004); AccuZIP, Inc. v. Dir., Div. of Tax'n, 25 N.J. Tax 158, 181, 185 (Tax 2009). The minimum tax applied to all entities regardless of P.L. 86-272 status. At that time, the court was not called upon to determine whether a tax that specifically and exclusively targeted P.L. 86-272 entities was permissible.

The first phase of implementation of the AMA in effect from 2002 to June 30, 2006 applied to entities regardless of P.L. 86-272 status. As to this first phase, the Business Tax Study Commission[19] noted in its June 29, 2004 final report that "[t]he AMA has become the lightning rod of criticism regarding New Jersey's tax policy and the changes made by the BTRA. . . . The AMA is perceived as an unfair and burdensome tax by both in-state and out-of-state corporations." N.J. Corp. Bus. Tax Study Comm'n, Final Report 20 (June 29, 2004). In the environment of such outcry, the Legislature did not take any steps to reinstate a broad-based AMA when it sunset on June 30, 2006.

As to the second phase of the AMA which only targets P.L. 86-272 entities, the Commission found "that subjecting only those out-of-state corporations to the

---

[19] As part of the Business Tax Reform Act, the Legislature established a Corporation Business Tax Study Commission. L. 2002, c. 40, § 31.

AMA is unfair" and noted that "commentators have argued that the sunsetting of the AMA only for regular CBT taxpayers and not for taxpayers that are protected from a net income based tax by P.L. 86-272 violates the Commerce Clause . . . ." Id. at 22. The Commission declined to wade into the precise issue now before the Court. Ibid. However, the Commission, by a majority vote, "recommend[ed] that the AMA rates, as applied to companies that are protected from a tax based on or measured by income under P.L. 86-272, be set at zero for tax years beginning on or after July 1, 2006." Ibid. In other words, with the sunset as to regular taxpayers on June 30, 2006, the Commission recommended that the AMA would not apply to any taxpayers.

This may also be a different case if the taxation of P.L. 86-272 entities under the AMA is merely incidental and had some basis separate and apart from capturing tax revenues from P.L. 86-272 entities. For example, if the Legislature did not base the imposition of a gross profits or gross receipts tax upon P.L. 86-272 status, but rather imposed the tax based upon some other classification (e.g., all makers of tomato sauce) with the result of sweeping in P.L. 86-272 entities. The court need not resolve this issue at this time. Instead, the plain language of the legislation indicated the target criteria was P.L. 86-272 status, and to drive the point home the legislative history indicates that the AMA "effectively capture[s]" P.L. 86-272 entities that do not pay net income tax under the CBT. Committee Statements at 5.

Overall, based upon the foregoing, the AMA is preempted by P.L. 86-272.

### F. The Director's Arguments as to Salerno

The Director further argues that the AMA should survive in some way because it meets the facial constitutionality test articulated in United States v. Salerno, 481 U.S. 739 (1987). Under this test of constitutionality, "the challenger must establish that no set of circumstances exists under which the [a]ct [in question] would be valid." Id. at 745. The Director's argument fails on both factual and legal grounds.

The Director sets forth what it alleges are four factual examples where the tax does not impair P.L. 86-272. The first two examples are when the tax is zero because the taxpayer's gross profits are below one million dollars or its gross receipts are below two million dollars. Thus, the Director argues that the tax can stay in place, so long as there is not a tax. The third argument is that the tax is zero if the P.L. 86-272 taxpayer consents to pay the CBT on net income. However, as explained in greater length above, this coercion stands as a clear obstacle to the will of Congress. The Director's fourth argument is that even if the taxpayer pays AMA in year one, it can seek credit in outlying years if subject to the CBT in the outlying years because P.L. 86-272 protection is lost. What this example ignores is the fact that in year one the taxpayer is out-of-pocket for money paid and the time-value thereof without some definite guarantee of obtaining a credit in outlying years. All four arguments are disingenuous.

-38-

Moreover, there is a fundamental legal problem in the Director's attempt to apply Salerno to a Supremacy Clause preemption case. The Director conflates constitutional challenges on grounds such as the Due Process Clause or dormant Commerce Clause with what is in essence a form of choice-of-law determination under the Supremacy Clause. For this analysis, both P.L. 86-272 and the AMA are accepted as otherwise constitutional. In other words, both are considered to satisfy the Due Process and dormant Commerce Clause for purposes of Supremacy Clause analysis. The court must merely decide which law, P.L. 86-272 or the AMA, is controlling.

It must be remembered that the Supremacy Clause is not a right in and of itself, but rather provides a rule of decision for deciding these federal-state conflicts. Armstrong, 575 U.S. at 324-25. Preemption does not mean the state law is forever invalid. Rather, it is displaced so long as the federal law is on the books. Constantino, 348 N.J. Super. at 332. If the federal law is repealed, the state law would no longer be preempted. Ibid.

Moreover, displacement does not necessarily mean the state law is totally without force and effect, only that it does not apply where the federal law applies. For example, in Chamber, the Court determined that the National Labor Relations Act preempted the New Jersey Strikebreakers Act in certain instances. Chamber, 89 N.J. at 163. The Court did not invalidate the act, but rather limited its application to

-39-

employees not covered by the National Labor Relations Act such as agricultural, supervisory and governmental employees. Id. at 153, 163. While this faintly sounds like Salerno, it is not. Salerno has to do with outright constitutional invalidity. The court has not determined the AMA to be invalid outright. Rather, the AMA is displaced while P.L. 86-272 is on the books. The court is unaware of any situation where the second phase of the AMA taking effect in 2006 would not be displaced since it exclusively applies to P.L. 86-272 entities. Resultantly, P.L. 86-272 displaces the second phase of the AMA which exclusively targets P.L. 86-272 entities.

Grounds such as preemption must be considered prior to outright constitutional invalidity. Once preemption is found, the Court need not reach the issue of outright constitutional invalidity. Ariz. Pub. Serv., 441 U.S. at 146 (finding preemption, the Court "do[es] not reach substantive constitutional issues."); Townsend v. Swank, 404 U.S. 282, 285, 291 (1971) (finding preemption, the Court need not reach constitutional equal protection issue); Auto. Club of N.Y., Inc. v. Dykstra, 520 F.3d 210, 212 (2d Cir. 2008) (finding "preempt[ion] we need not reach the constitutional issues raised by the parties.")

With the AMA displaced by applying the decisional framework of the Supremacy Clause, the court never has to reach the issue of whether the AMA is unconstitutional under the dormant Commerce Clause, Due Process Clause or Equal

Protection Clause. Thus, the Director's urging to apply Salerno as was done previously in Whirlpool is inapposite since Whirlpool was a dormant Commerce Clause case, not the implementation of the Supremacy Clause to resolve competing Congressional and Legislative action. Whirlpool Properties, Inc. v. Dir., Div. of Tax'n, 208 N.J. 141, 150, 165 (2011). Parenthetically, the New Jersey Supreme Court also noted as to Salerno that "questions have arisen as to its continued validity" and "there exists a measure of uncertainty over the use of Salerno as the de facto standard for facial challenges to the constitutionality of a statute." [20] Whirlpool, 208 N.J. at 175, 176. In any event, this court need not jump into the murky waters of whether Salerno is of continued validity.

Notably, the United States Court of Appeals for the Third Circuit rejected the Salerno test in preemption cases in which the government "conjure[s] up just one hypothetical factual scenario in which implementation of the state law would not directly interfere with federal law." Lozano v. City of Hazelton, 724 F.3d 297, 313 n. 22 (3d Cir. 2013). The factual scenarios conjured up by the Director in this case aptly demonstrate the concern expressed by the Third Circuit in Lozano.

The issue resolved by the court is not whether a state statute, the AMA, is outright unconstitutional. Rather, the issue is whether the AMA is preempted by

---

[20] The Court raised these issues again in In re Contest of November 8, 2011 General Election, 210 N.J. 29, 46 (2012). However, Contest, like Whirlpool, did not involve preemption issues.

-41-

P.L. 86-272. The Supremacy Clause in the Constitution provides the framework for the decision, but does not render the AMA forever invalid, but merely ineffective while P.L. 86-272 remains on the books. Salerno is simply inapplicable since a direct constitutional challenge as to validity has not been reached.

## G. The AMA Cannot be Considered a Compensatory Tax

In a last-ditch effort to save the AMA from preemption, the Director argues that the AMA is a compensatory tax. A compensatory tax has been applied in dormant Commerce Clause cases, that is, cases in which Congress has not spoken. The dormant Commerce Clause "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." Or. Waste Sys., Inc. v. Dep't of Envtl. Qualtiy of Or., 511 U.S. 93, 98 (1994). However, "[i]nterstate commerce may be made to 'pay its way'" even if the law discriminates against interstate commerce. Id. at 102 (quoting Complete Auto Transit, 430 U.S. at 281). "It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden[s]." Id. at 102 (quoting Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 254 (1938)). A compensatory tax "is merely a specific way of justifying a facially discriminatory tax as achieving a legitimate local purpose that cannot be achieved through nondiscriminatory means." Ibid. "Under that doctrine, a facially discriminatory tax that imposes on interstate commerce the rough equivalent of an identifiable and

'substantially similar' tax on intrastate commerce does not offend the negative [dormant] Commerce Clause." [21] Id. at 102-103 (quoting Maryland v. Louisiana, 451 U.S. 725, 758-59 (1981)).

Simply stated, the compensatory tax doctrine has been applied by the courts to situations in which Congress has not spoken and the negative or dormant Commerce Clause is primarily controlling. Without an act of Congress, it is "the Court, and not Congress, that is limiting the lawful prerogatives of the States." Wayfair, 138 S. Ct. at 2097. In this case, Congress has spoken through enactment of P.L. 86-272 and has indicated that a net income tax cannot be applied to the out-of-state sellers of tangible products that meet certain criteria.

Regardless of the merits, a state legislature cannot enact a "compensatory" measure which undercuts Congress' mandate. A compensatory measure here would be tantamount to invalidating the efficacy of the Congressional provision. Courts are not the final arbiter as to the Commerce Clause when Congress has spoken. See

---

[21] For example, in Henneford v. Silas Mason Co., 300 U.S. 577 (1937), the State of Washington had a sales tax on in-state sales. Id. at 579. Likewise, Washington also had a use or compensatory tax on items purchased out-of-state, but used in-state. Id. at 579-80. However, if sales tax was paid to another jurisdiction, the compensatory or use tax would be reduced by the sales tax paid. Id. at 580.

The taxpayers in Henneford argued that the compensatory or use tax only applied to products brought in from out-of-state and therefore discriminated against interstate commerce. Id. at 581. In rejecting this argument, the Court indicated that "the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates." Id. at 584.

-43-

Merrion, 455 U.S. at 154-55. There are exceptions, of course, such as where the federal law at issue is at odds with due process, equal protection or Tenth Amendment rights.[22] However, there is not a challenge to the validity of P.L. 86-272. Since Congress has spoken, the AMA cannot be construed as an attempt to "compensate" under the dormant Commerce Clause. Rather, the AMA is an attempt to eviscerate the properly expressed will of Congress enacted pursuant to the affirmative words of the Commerce Clause.

As pointed out by the taxpayer in this case, to argue that the AMA compensates for the CBT is to recognize that the AMA stands as an obstacle to the congressional mandate of P.L. 86-272. The Legislature's attempt to "compensate" in this case is nothing more than an effort to ignore P.L. 86-272.

Congress has spoken and indicated what it wants done as to net income taxation of certain interstate businesses. This is not a case where the State imposed a gross receipts or gross profits tax upon all businesses. Rather, New Jersey decided to impose the AMA only upon entities protected by P.L. 86-272. Even if the AMA is somehow arguably "compensatory" in the literal sense of the word, it stands as a clear obstacle to the will of Congress exercised pursuant to the Commerce Clause and imposed upon the State by the Supremacy Clause. Thus, the AMA does not fit

---

[22] See supra at n. 10.

within the compensatory tax framework as enunciated by the United States Supreme Court.

## H. <u>Summary of Legal Conclusions</u>

In large part, the Constitution governs the relationship between state and federal governments. In ratifying the Constitution a long time ago in 1787, New Jersey agreed that when there is a conflict between state and federal provisions affecting commerce, the federal provisions prevail.[23] The framers of the Constitution, having the insight that issues such as the one now facing the court would find their way into state courts, included a provision in the Supremacy Clause that specifically commanded the judges of state courts to obey the will of Congress, regardless of any contrary state law. <u>U.S. Const.</u> art. VI, cl. 2. The courts play a significant role in assuring the supremacy of federal law. <u>Armstrong</u>, 575 U.S. at 326. For once a case or controversy comes before the court, judges are bound by federal law despite state law provisions to the contrary. <u>Ibid.</u>

The court is not merely a legislative agent blindly implementing the will of the Legislature. <u>See, e.g.,</u> <u>In re 1984 General Election for Office of Council</u>, 203 N.J. Super. 563, 577 (Law Div. 1985) (rejecting concept of a court sitting as

---

[23] To be exact, the people of New Jersey indirectly ratified the Constitution through elected delegates on December 18, 1787. 3 <u>The Documentary History of the Ratification of the Constitution</u> 162-86. (Merrill Jensen ed. 1978).

legislative agent in election contests). The court has a sworn obligation to uphold both the state and federal constitutions. See, e.g., U.S. Const. art. VI, cl. 3. This court is acutely aware of this role in determining legislative intent and does not take this responsibility lightly.

The legislative history does express the frustration of the Legislature in ensuring everyone pays their fair share. Equip. Leasing & Finan., 24 N.J. Tax at 536. See also Committee Statements at 5. There was concern that P.L. 86-272 entities "exploit the State's marketplace" and reform was needed to "effectively capture" their activities. Ibid. The sponsor of the bill wanted to stop P.L. 86-272 entities from "evad[ing] and exploit[ing] the system." Senate Sponsor's Statement at 52 and Assembly Sponsors' Statement at 51 (2002). The goal was to "provide[] a level playing field for all businesses, large and small, that invest in New Jersey, employ our citizens and do business here." Ibid. While attempts to tax everyone fairly is certainly a laudable purpose, the second phase of the AMA obliterates the protections of P.L. 86-272 and is thereby contrary to supremacy of Congressional action as required by the Constitution. Despite the inequities, either real or perceived, of P.L. 86-272, the Legislature is not free to ignore the will of Congress and neither is this court.

P.L. 86-272 was adopted as a temporary measure many generations ago. After some sixty years of inaction, it may or may not be time for Congress to take

another look at this provision, especially with the shift in the economy from a manufacturing (i.e. tangible goods) economy to a service economy.

While it is certainly arguable whether P.L. 86-272 is unfair, that cannot be the point of any ruling. That is a quarrel for the Legislature to have with Congress. The fairness of P.L. 86-272 is a policy debate which cannot be resolved by the courts. Comm. To Recall Robert Menendez from the Office of U.S. Senator v. Wells, 204 N.J. 79, 128 (2009). On one hand, the Legislature is seeking a "fair measure of support for State services [from P.L. 86-272 entities]." Committee Statements at 5. On the other hand, Congress had a rational basis in wanting to provide clarity in how entities involved in interstate commerce would be taxed. Heublein, 409 U.S. at 279-280. "It is not for [the court] to say whether the means chosen by Congress represent the wisest choice. It is sufficient that Congress was not irrational. . . ." Fed. Energy Regul. Comm'n v. Mississippi, 456 U.S. 742, 758 (1982). In light of the Supremacy Clause, this court is not free to impose its own vision of fairness, or that of the Legislature, upon the will of Congress exercising its powers pursuant to the Commerce Clause. Courts are the final arbiter under the Commerce Clause when Congress has not acted. See Merrion, 455 U.S. at 154-55. Here, Congress has acted.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the Director's motion for reconsideration of the court's entry of partial summary judgment in favor of the taxpayer and denial of the Director's motion for partial summary judgment is denied.